2021 IL App (1st) 171400

FIRST DISTRICT
SIXTH DIVISION
December 17, 2021

No. 1-17-1400

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 8449 |
| | ) | |
| DONQUILA BUTLER, | ) | Honorable |
| | ) | Carl B. Boyd, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Mikva and Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Donquila Butler, appeals his conviction of two counts of aggravated criminal sexual assault and one count of kidnapping after a bench trial. On appeal, defendant contends (1) the trial court erred in denying his motion to quash arrest and suppress evidence where the police arrested him without probable cause that he committed a crime; (2) alternatively, the trial court should have suppressed the fruits of his arrest where he was seized pursuant to a police investigative alert; and (3) the cause should be remanded for a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), where the trial court failed to inquire into defendant's ineffective assistance of counsel claim. For the following reasons, we affirm the trial court's judgment that probable cause existed for police to arrest defendant but remand the matter for the trial court to conduct a *Krankel* hearing.

No. 1-17-1400

¶ 2                                 I. JURISDICTION

¶ 3       The trial court denied defendant's motion to reconsider on May 30, 2017. Defendant filed a notice of appeal on June 5, 2017. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                 II. BACKGROUND

¶ 5       Prior to trial, defendant filed a motion to quash arrest and suppress evidence wherein he argued that his arrest without a warrant and without probable cause violated his constitutional rights. At the hearing on the motion, Blue Island Police Officer David Stone testified that on April 29, 2011, he was assigned to patrol. At the roll call, detectives informed the officers that defendant was wanted in connection with several sexual assault cases. They were advised to look for a black 1999 Lincoln Continental with three-spoke chrome rims bearing the license plate H716863. The detectives showed them a photograph of defendant.

¶ 6       Later that day, Stone was on patrol when he spotted a 1999 black Lincoln Continental with three-spoke chrome rims in the area of 127th Street and Vincennes Road. He checked the license plate and confirmed it was a match. Stone stopped the car and observed that the driver was the same person depicted in the photograph at the police station. He radioed for assistance and detained defendant, who was not free to leave. Detective Jeff Werniak and his partner responded to Stone's call, and defendant was transported to the Blue Island police station. Stone did not have an arrest or a search warrant for defendant.

¶ 7 Werniak testified that on April 25, 2011, he was assigned to investigate a sexual assault against S.J. He interviewed her briefly at the hospital and then interviewed her at her home the following day. She told him that on April 25, 2011, in the late evening, she was walking southbound on Western Avenue when she noticed a black four-door car that kept passing her northbound and southbound on Western Avenue. The driver stared at her as he passed. She described the driver as a black male who was the only person in the car. She felt uncomfortable so she turned off Western Avenue and walked one block west to Artesian Avenue, heading south towards her home. S.J. was then assaulted on Artesian Avenue.

¶ 8 S.J. believed that her assailant was the same person she saw driving the black car. She described her attacker as a black male in his upper twenties, with a light caramel complexion and a thin goatee-style beard, which was nicely trimmed. She described the car as a four-door sedan similar to a Buick. The car was black with a power moon roof and very distinctive "3-bladed" chrome rims. S.J. pointed out the rims when shown different types of rims on the Internet. Werniak referred to the rims as "wishbone rims." A picture of this type of rim was included in an investigative alert to fellow officers. S.J. described her assailant to an investigator, who created a composite sketch. This sketch was also included in the alert.

¶ 9 Werniak went to Thornton's gas station in the area of the attack to see if their surveillance video captured anything useful to the investigation. He viewed the video, which showed S.J. walking southbound on Western Avenue and cutting through the Thornton's parking lot. Right after she cut through the lot, a black four-door car with a power moon roof and chrome wishbone rims pulled into the gas station. The video showed a black male, who Werniak identified as defendant, get out of the car and go into the store. Inside, video showed that defendant purchased

condoms with a credit card. Thornton's corporate security records revealed that defendant's name was on the card used to purchase the condoms. Werniak obtained a driver's license photo of defendant and recognized him as the person he saw on the video getting out of the black car and going into the Thornton's store to purchase condoms.

¶ 10     The following day, April 29, 2011, Werniak attended a roll call meeting at the Blue Island police station where he advised patrol officers that he was looking for defendant in connection with three sexual assaults in Blue Island. They also should look for a black four-door Lincoln with a power moon roof and chrome wishbone rims bearing license plate number H716863. Werniak showed officers defendant's driver's license photo. Later that day, Werniak responded to a traffic stop near 127th Street and Vincennes Road. He saw defendant in the back of Stone's car and, directly behind, he saw a black four-door Lincoln with a power moon roof and chrome wishbone rims. He recognized defendant as the same man he saw in the video surveillance tape from Thornton's. Defendant was transported to the Blue Island police station and placed in a cell.

¶ 11     On cross-examination, Werniak stated that the wishbone rims were distinctive and "very rare." Also, defendant was not free to leave when he saw him sitting in back of Stone's police car. Werniak acknowledged that S.J.'s description of her attacker was a fairly general description.

¶ 12     The trial court denied defendant's motion to quash arrest and suppress evidence, finding that "there was more than probable cause to arrest this Defendant at that time and location." Defendant also filed a motion *in limine* to bar DNA evidence, which the court denied after hearing arguments.

¶ 13     At the bench trial, S.J. testified that on the night of April 25, 2011, she was 18 years old. Around 10 p.m., S.J. walked her friend from her home to the bus stop at 119th Street and Western

Avenue. After her friend got on the bus, S.J. walked on Western Avenue to go home. She walked about half a block when she noticed a black sedan pass her as it drove towards 123rd Street. The car had distinctive Y-shaped rims. The car passed her and then turned around, driving past her again going in the other direction towards 119th Street. The car repeated this pattern, driving past S.J. at least three times. S.J. became nervous because she thought the car was following her. She turned at 121st Street at the Thornton's gas station and walked towards Artesian Avenue, the next street over.

¶ 14    S.J. did not see anyone on Artesian Avenue but as she walked, she heard footsteps behind her. She looked back and saw a man about a half block behind her. She walked faster, but the man behind her began to walk faster too. S.J. looked back again and the same man was right behind her, about three feet away. She described him as African-American, with a stocky build and about 5 feet, 9 inches, tall. He was wearing a black hoody pulled up over his head but not covering his face. S.J. identified defendant as the man who walked behind her that night.

¶ 15    S.J. testified that defendant grabbed her around her neck with his arm. He told her not to refuse. He said, "do you want to die, it's just some p*** or something like that." S.J. continued to resist, and she tried to look at the attacker's face. He then hit her in the eye with his fist. Defendant pulled her away from the street to the side of a house, next to a black garbage bin and some bushes and rocks. S.J. tried to call the police with her cell phone, but defendant told her to give it to him. When she refused, defendant grabbed it from her as he kept his arm around her neck. S.J. was having trouble breathing.

¶ 16    Defendant told S.J. to take off her pants, and when she refused to comply, he pulled down her pants and underwear. He forced her to bend over and then he touched her vagina with his hand.

He tried to insert his penis into her vagina, but he could not do so. Defendant then forced S.J. to the ground. As she lay on her back, S.J. tried to look at defendant's face but he told her to cover her face. She covered her face with her hands, but she peeked through her fingers to see him. Defendant penetrated her vagina with his penis. S.J. did not consent and the penetration was painful. She was scared because she thought she was going to die. Before he penetrated her, S.J. heard something that sounded like a plastic wrapper. She thought it was a condom wrapper.

¶ 17    After defendant completed the assault, he got up and ran towards Artesian Avenue. S.J. waited briefly to make sure he was gone, and then she ran home. She told her aunt what happened, and they called 911. S.J. spoke to a police officer and then she was transported to the hospital where a nurse conducted a sexual assault examination.

¶ 18    The next day, Werniak came to speak with her. They drove to the area where the assault occurred, and S.J. looked for her phone but could not find it. On April 28, 2011, she sat with an investigator who created a composite sketch of the offender. Later, she viewed a lineup and identified defendant as her attacker. S.J. did not speak to any witnesses before viewing the lineup nor was she told who to identify. At trial, she identified photographs of the scene, as well as a photograph of the car that was following her on April 25, 2011. S.J. also identified herself walking on the surveillance video as a car followed her.

¶ 19    S.J. acknowledged that the gas station was open at the time and Western Avenue was a busy, well-lit street. She could not see her attacker when he put his arm around her neck. She also did not see where her attacker fled after the assault, only that he ran down the street. She testified that as she went to view the lineup, Werniak told her they were pretty sure they had the guy. She

stated that the windows of the car that passed her may have been tinted because, as it drove by, she did not see anyone on the inside.

¶ 20    Linda Brown testified that in 2011, she lived with S.J. in a third-floor apartment at 123rd Street in Blue Island. On April 25, 2011, after 10 p.m., there was a thump at the door. When she opened it, S.J. fell into the apartment crying hysterically. She kept repeating that she was raped. Brown dialed 911, and the police and an ambulance came to the apartment. Brown accompanied S.J. as she was transported to the hospital. Brown identified her voice on the 911 call and admitted that she told the dispatcher the attacker was dressed in all black and wore a mask. She identified S.J. crying in the background of the call and saying something, after which Brown told the dispatcher that the man was wearing a black hoody.

¶ 21    Jaclyn Rodriguez testified that she was a certified sexual assault nurse examiner (SANE). On April 25, 2011, she was working as an on-call SANE nurse when she met S.J. at the hospital. Rodriguez conducted a forensic medical sexual assault examination on S.J. and asked her about the assault. S.J. described her attacker as a man with caramel colored skin and a goatee, medium build, about 5 feet, 9 inches, or 5 feet, 10 inches, who wearing a black hoody. He also drove a black Buick with rims. S.J. described the attack but was not sure whether he ejaculated inside or outside of her body. She was unsure whether he used a condom. Rodriguez observed an abrasion to S.J.'s right earlobe as well as swelling at the bridge of her nose that was painful to the touch. She noted small tears to the perineum, the space between the anus and vulva. She observed tears to the labia minora and redness to the hymen. Rodriguez took photographs and prepared swabs for testing.

¶ 22    Lisa Fallara, a forensic scientist, tested the swabs and identified a DNA profile that matched defendant's profile. She testified that the DNA profile would be expected to occur in approximately 1 in 1000 unrelated African American males, 1 in 1900 unrelated Caucasian males, and 1 in 1000 unrelated Hispanic males.

¶ 23    Stone testified that on April 29, 2011, he worked a shift as a patrol officer. Before going out on patrol, he attended a roll-call meeting at the station where they were advised of things going on in the community. At the meeting, detectives told the officers to look out for a black 1999 Lincoln four-door vehicle. They were given a license plate number and the name of the registered owner. They were also told that the vehicle had three-spoke, shiny chrome rims. Detectives said the owner was wanted for questioning.

¶ 24    Around 4:06 p.m., Stone was driving eastbound on 127th Street. As he turned north on Vincennes Road, he observed a black Lincoln with the license plate number he was given and the chrome rims coming towards him. He made a U-turn and activated his lights. The black Lincoln pulled over to the curb, and Stone parked behind it. He saw one person in the car, and he identified defendant as that person. Stone testified that he did not have an arrest or search warrant when he stopped defendant. He could not recall if he told defendant he was under arrest, but defendant was not free to leave. Stone radioed that he spotted the black Lincoln, and Werniak came to their location. Stone believed that defendant was handcuffed and in custody when Werniak arrived.

¶ 25    Werniak testified that he had been a detective with the Blue Island Police Department for 21 years. On April 25, 2011, into the early morning hours of April 26, Werniak was assigned to investigate an aggravated criminal sexual assault involving S.J. He met her at her home and obtained a description of the offender. He took S.J. to the area on Artesian Avenue where the attack

occurred, which was approximately two blocks from her home. She described the car she saw before the assault as dark, with four doors, possibly a Buick. It also had a moon roof or sunroof and distinctive chrome rims with a wishbone pattern.

¶ 26    Werniak brought S.J. to the police station where an investigator made a composite sketch of the offender. S.J. was also shown pictures of chrome rims on the internet and she identified the type of rim she saw on the black car. He knew from S.J.'s description that she passed the Thornton's gas station at 12052 S. Western Avenue. He was also aware that Thornton's used surveillance cameras that recorded video. After speaking with S.J., Werniak went to Thornton's and viewed a recording made around 10 p.m. on April 25, 2011.

¶ 27    On the video, Werniak saw the car S.J. described pull into the gas station. He observed the driver get out of the car and go into the store. Interior cameras showed he picked up an item near the register and paid for it. Werniak was familiar with the Thornton's surveillance system and testified that when a purchase is made, the item purchased appears on the surveillance video. When defendant purchased his item, the video showed that he purchased a package of Trojan condoms. Defendant got back into his car and backed up. He then drove northbound on Western Avenue, cut across, and came back southbound through an alley. The car then crossed Western Avenue into a Popeye's Chicken parking lot. As the defendant was backing up, Werniak observed S.J. walking by. She cut through the parking lot and walked west on 121st Street towards Artesian Avenue. Werniak could not identify S.J.'s face on the video, but he could see the color of clothing she wore.

¶ 28    Werniak identified the State's Exhibit 19 as a true and accurate copy of the Thornton's video he viewed. Clips of the video were published at trial. The video showed a black four-door vehicle with wishbone rims pull into Thornton's at 10:01 p.m. A man wearing a black hooded

sweatshirt and dark clothing got out of the car and entered the store. As he left the store, a logo design of skeletons or skulls was visible on the hood of his sweatshirt. After viewing the video, Werniak contacted Thornton's legal department and obtained the name of the person whose debit card was used to purchase the condoms. The card was in defendant's name.

¶ 29    Werniak obtained defendant's driver's license photo, and when he compared it with the person on the video from Thornton's, they matched. He also checked the computer system and found that defendant owned a black 1999 Lincoln Continental. He informed patrol units of defendant, his vehicle, and his license plate number because they matched the description S.J. gave of her assailant and the video footage Werniak observed. When he learned that the vehicle had been stopped, he went to the location and confirmed that it was defendant. On April 30, 2011, S.J. and another assault victim, T.P., came to the station to view lineups. They did not arrive together, and they were kept apart at the station. T.P. viewed the lineup and identified defendant as the man who sexually assaulted her in January 2011. S.J. then viewed the lineup. Werniak did not tell her he was 99% sure they had her attacker. S.J. also identified defendant as the person who assaulted her.

¶ 30    On May 1, 2011, Werniak and other officers executed a search warrant at defendant's apartment in Harvey. They recovered Polo boots, a box of Trojan Twisted condoms, and a black hooded sweatshirt with 2 skulls on the back of the hood.

¶ 31    T.P. testified that on January 11, 2011, she lived near 121st Street and Western Avenue in Blue Island. Around 10 p.m., she was babysitting her nephews when she left to get food at McDonalds and Walgreens a couple blocks away. Walking home, she noticed a dark colored vehicle she described as a Mercury Marquis. She thought the car was suspicious because the engine

was still running. She did not remember chrome rims. As she walked, a man came from behind and grabbed her. He was wearing a black coat and black scarf, and he had a gun. He pulled her hood over her head and put the gun to her left side. He told T.P to walk with him. She tried to look at him, but he told her not to look at him or he would shoot her. They went to a house where he took her down a flight of exterior cellar stairs. There was a light from a porch across the alley, which sometimes shined on their faces. He told T.P. to bend over and he put a gun to her back. He forced her to pull down her pants and then he shoved his penis into her anus. T.P. testified that it hurt so she "leaned up," but the man pushed her down with the gun to her back. When she was bent over, T.P. observed a scar on her attacker's left leg between his thigh and his knee.

¶ 32    After the assault, T.P. noticed that her assailant was wearing Polo boots. She also saw that his scarf had fallen so she could see everything except part of his mouth. He told her not to look at him. As they walked, he told T.P. to keep walking and that if she turned around he would shoot her. T.P. left and never looked back. When she got home, she told her mother she had been raped. They called 911, and T.P. went to the hospital. She described the man to police as 5 feet, 8 inches, to 6 feet tall, between 280 and 300 pounds, with blemishes under his eyes. In court, T.P. identified defendant as the man who assaulted her. She also identified defendant in a lineup at the police station on April 30, 2011.

¶ 33    The State rested and defense counsel moved for a directed verdict, arguing that Stone arrested defendant without probable cause. The trial court denied the motion.

¶ 34    Defendant denied he sexually assaulted T.P. or S.J. He testified that on April 25, 2011, he was driving his black Lincoln with the Y-shaped rims. He stopped at a Shell station at 119th Street and Western Avenue to get gas. He also wanted to use the ATM but was told they were in the

middle of a shift change and to come back later. Defendant admitted that he went to Thornton's that night to buy condoms. He got back into his car after purchasing the condoms and left. He planned to meet someone at Popeye's to buy weed, so he made a left turn out of Thornton's parking lot onto Western Avenue. When the person who was supposed to sell him weed did not show up, defendant left Popeye's and went to the Shell station to buy gas. He then drove to Harvey via Interstate 57.

¶ 35    On April 29, 2011, defendant was interviewed by detectives. He testified that he did not tell them he was going to Popeye's to buy weed. Instead, he told detectives that he planned to meet a woman named Kiana at Popeye's on April 25, 2011, and that is why he stopped at Thornton's to buy condoms. Defendant met Kiana at 119th Street and Marshfield Avenue and then followed her onto the interstate to a motel in Markham. He could not remember the name of the motel, but he gave an unknown female $20 to let him use a room she was leaving. Defendant told detectives that he had sex with Kiana for approximately two hours.

¶ 36    When he spoke with detectives on April 30, 2011, he admitted he lied about meeting Kiana. He waited for her, but she did not show up. He testified that he lied to police about buying weed because he did not want to be arrested for that. Defendant acknowledged that he lived in the basement apartment in Harvey and owned two pairs of Polo boots. He stated, however, that the boots depicted in the State's Exhibit 49 do not belong to him. Defendant testified that two other men lived with him. Defendant admitted that the hooded sweatshirt depicted in Exhibit 55 was his and the photograph of a leg with a scar depicted his leg.

¶ 37    Werniak testified in rebuttal. He stated that a still photo taken from the video recording at Thornton's showed defendant's car turning northbound out of Thornton's and that Popeye's was to the south.

¶ 38    The trial court found defendant guilty of two counts of aggravated criminal sexual assault and one count of kidnapping. Defendant filed a motion for a new trial which the trial court denied. After a hearing, the court sentenced him to 12 years for each of the sexual assault counts and 4 years for the kidnapping count, to be served consecutively per the statute. The trial court subsequently denied defendant's motion to reconsider, and defendant filed this appeal.

¶ 39                                III. ANALYSIS

¶ 40    Defendant first contends that the State violated his constitutional right against unreasonable seizures when the police arrested him without a warrant and without probable cause. He argues the trial court thus erred in denying his motion to quash arrest and suppress evidence.

¶ 41    In order to make a warrantless arrest, police must have probable cause. *People v. Mitchell*, 45 Ill. 2d 148, 153 (1970); *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause exists when the facts and circumstances known to the officer at the time of the arrest lead a reasonable person "to believe that an offense had been committed and that the offense was committed by the person arrested." *People v. Sims*, 192 Ill. 2d 592, 614 (2000). This fundamental principle is codified in section 107-2 of the Code of Criminal Procedure of 1963 (Code), which provides that "[a] peace officer may arrest a person when: *** [he or she] has reasonable grounds to believe that the person is committing or has committed an offense." 725 ILCS 5/107-2(1)(c) (West 2018). "The statutory phrase 'reasonable grounds' has the same substantive meaning as 'probable cause.' " *People v. Lee*, 214 Ill. 2d 476, 484 (2005).

¶ 42    In a probable cause determination, the salient issue is probability of criminal activity rather than proof of it beyond a reasonable doubt. *People v. Garvin*, 219 Ill. 2d 104, 115 (2006). Mere suspicion, however, is inadequate to establish probable cause to arrest. *Sims*, 192 Ill. 2d at 614-15. Probable cause is a determination made based on the totality of the circumstances at the time of the arrest. *Id.* at 615. While this court gives deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence, we review the court's ruling on probable cause *de novo*. *People v. Grant*, 2013 IL 112734, ¶ 12.

¶ 43    The following facts were known to police at the time of defendant's arrest. S.J. reported that on April 25, 2011, around 10 p.m., she walked a friend to the bus stop on Western Avenue. As she walked home, she noticed a car pass her several times alternating directions. The driver stared at her as he passed, making her uneasy. She described the car as dark, with four doors, possibly a Buick. It also had a moon roof or sunroof, and distinctive chrome rims with a wishbone pattern. S.J. turned off of Western Avenue towards Artesian Avenue to get away from the car. As she walked on Artesian Avenue, someone came from behind, grabbed her around the neck, and raped her. S.J. described her attacker as a black male in his upper-twenties, with a light caramel complexion and a thin goatee-style beard that was nicely trimmed. She believed that the driver of the black car was the person who assaulted her. At the police station, S.J. spoke with an investigator who made a composite sketch of the offender. She also identified the type of rim she saw on the black car. These rims were "rare" for cars in Blue Island. The sketch and S.J.'s description of the car were included in an investigative alert.

¶ 44    Surveillance video at Thornton's showed that around 10 p.m. on April 25, 2011, a car fitting S.J.'s description pulled into the gas station. The driver, a black male, got out of the car and

purchased a package of Trojan condoms in the store. He returned to his car and drove northbound on Western Avenue, cut across, and drove southbound. The car then crossed Western Avenue into a Popeye's Chicken parking lot. As the car backed up, S.J. is seen walking by. She cut through the parking lot and walked west on 121st Street towards Artesian Avenue.

¶ 45    Police obtained defendant's name through the card used to purchase the condoms. They then obtained defendant's driver's license photo, which matched the person seen on Thornton's videotape. A check of the computer system revealed that defendant also owned a black 1999 Lincoln Continental. Werniak testified that defendant and his car matched the descriptions given by S.J. and the video footage Werniak observed. On April 29, 2011, after being advised of defendant and his vehicle by detectives at a roll call meeting, Stone stopped defendant's car and placed defendant into custody.

¶ 46    While Stone did not have personal knowledge of the facts underlying the investigation, probable cause may be established from the collective knowledge of police officers working in concert. *People v. Moore*, 378 Ill. App. 3d 41, 48 (2007). The totality of the facts and circumstances known to police at the time of defendant's arrest would lead a reasonably cautious person to believe that defendant sexually assaulted S.J. on April 25, 2011. Therefore, police had probable cause to arrest defendant after confirming the license plate number of his car and observing that he was the same person depicted in the photograph at the police station.

¶ 47    Defendant acknowledges that he was in the area of the attack when it happened. He argues, however, that mere proximity to the crime scene is not enough to show probable cause. He cites *People v. Hopkins*, 235 Ill. 2d 453 (2009), where the court listed factors it considered in addition to proximity, including the number of persons at the crime scene, a particular description of the

offender, the amount of time between the offense and defendant's arrest, the direction the offender fled, and whether defendant engaged in suspicious conduct before he was arrested. Pursuant to these factors, defendant argues there was no probable cause where (1) he was not doing anything suspicious at the time of his arrest, (2) S.J. did not know where her attacker went after the assault; (3) defendant was not the only person at Thornton's on the night of the assault, (4) S.J.'s description of her attacker was "fairly general" with no extraordinary characteristics, and (5) defendant was not arrested until four days after the offense occurred.

¶ 48    We do not dispute that these factors may be relevant to a probable cause determination. However, their relevance depends on the particular case at hand. *Hopkins* involved an armed robbery and an attempted armed robbery, where officers were alerted to a robbery in progress with a description of the offenders. *Id.* at 459. Soon after, defendant was stopped in the specified area where there were no other people around. *Id.* at 460. The supreme court looked at the totality of the circumstances known to the arresting officer (that a person fitting defendant's description was in the area of the crime at the time it occurred and was seen running in the direction stated by a witness) and found probable cause existed to effectuate an arrest. *Id.* at 477. The factors in *Hopkins* undoubtedly contributed to the finding of probable cause in that case.

¶ 49    A probable cause determination, however, is governed by commonsense, practical considerations instead of technical legal rules. *People v. Buss*, 187 Ill. 2d 144, 204 (1999). It is an objective, case-by-case determination based on the totality of the circumstances. *People v. Jackson*, 348 Ill. App. 3d 719, 727 (2004). While the timing of the defendant's arrest in *Hopkins* was significant to the probable cause analysis there, this case involved a sexual assault, which is not commonly reported to police as a crime in progress. Given the nature of this offense, the fact

that some time passed before police apprehended defendant has little relevance to the probable cause analysis here. See *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 4-8 (finding probable cause where the defendant was arrested eight days after the rapes occurred). For the same reason, it is irrelevant that S.J. did not know the direction her attacker fled after the assault or that defendant was not acting suspiciously when police arrested him four days later.

¶ 50 Also, S.J.'s "fairly general" description of her attacker's physical characteristics, and the fact that others were in the area on the night of the assault, did not preclude a finding of probable cause to arrest defendant. In *People v. Smith*, 222 Ill. App. 3d 473, 479 (1991), sexual assault victims described the male assailant as "a Caucasian, 5 feet 5 inches to 5 feet 7inches tall, between 140 and 150 pounds, 25 to 35 years old, with brown hair," and the woman with him was "a Caucasian, 5 feet 4 inches tall and approximately 140 pounds." Immediately after the reported assaults, the police received reports of auto thefts and thefts of purses and wallets in the same area, the southwest side of Chicago. In some of the cases, witnesses described the offenders as a male and a female with the same general descriptions as those given by the sexual assault victims. *Id.*

¶ 51 Several weeks later, police arrested the defendant and a female on the southwest side of the city in possession of a stolen vehicle. *Id.* The defendant was a male Caucasian, 37 years old, 5 feet, 7 inches tall, 150 pounds with brown hair, and police found a stolen wallet on the back seat. *Id.* The court noted that while the victim's failure to describe a distinctive physical feature could affect the credibility of that description, such an omission did not render the victim's description useless for purposes of determining probable cause. *Id.* at 479-80. The court found the defendant's physical characteristics "sufficiently similar to the descriptions given by S.W. and J.S. of the assailants to give rise to a reasonable inference that [they] were the assailants." *Id.* It concluded

that the totality of facts and circumstances known to the police at the time of the arrest provided the arresting officers with sufficient probable cause to detain the defendant. *Id.*

¶ 52    Defendant does not contend that S.J.'s description bore no resemblance to him; rather, he argues that her description could fit a number of people. As such, we presume that his features are sufficiently similar to S.J.'s description of the assailant. Moreover, identifiers other than defendant's physical appearance contributed to the probable cause determination in this case. S.J. not only described the perpetrator, but she also described the car she believed he was driving. The car had distinctive chrome wishbone rims, a type rarely found in the area. Her description enabled Werniak to identify the car driving near S.J. on April 25, 2011, and to identify defendant as the driver of the car, after viewing Thornton's surveillance video.

¶ 53    Defendant questions S.J.'s credibility in identifying his car, arguing that the record contains no testimony that his car was seen on Artesian Avenue where the assault occurred, or that S.J. saw her attacker get out of that car. We are mindful, however, that the probable cause calculation concerns only the probability of criminal activity. *Hopkins*, 235 Ill. 2d at 477. Probable cause does not require a belief that it is "more likely true than false" the suspect has committed a crime. *Id.* Therefore, "[e]ven a tentative identification may contribute to probable cause." *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 121. We find that given the totality of facts and circumstances known to them at the time of defendant's arrest, officers had sufficient probable cause to arrest defendant.

¶ 54    Alternatively, defendant contends that the trial court should have suppressed the fruits of his arrest because he was arrested pursuant to a police investigative alert. Defendant argues that an arrest following an investigative alert violates the Illinois constitution, which requires an assertion of probable cause in an affidavit and a probable cause determination by a neutral

magistrate before a person can be seized. As support, defendant cites *People v. Bass*, 2019 IL App (1st) 160640.

¶ 55    We note that our supreme court granted leave to appeal in *Bass* and recently issued its opinion in *People v. Bass*, 2021 IL 125434. The court agreed that the defendant's arrest without a warrant should have been quashed, where officers unreasonably extended their stop of the car he was riding in as a passenger. *Id.* ¶ 26. However, it vacated the portion of the appellate court's opinion that found the defendant's arrest pursuant to the investigative alert unconstitutional. *Id.* ¶ 31. The supreme court stressed that the appellate court had already found defendant's arrest invalid on another basis, and "cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort." *Id.* ¶ 30. To the extent defendant relies on the appellate court's decision in *Bass* for his argument that the Illinois Constitution requires a warrant to make an arrest, it is no longer good law and we decline to follow it.

¶ 56    Furthermore, we have already determined that probable cause existed to arrest defendant without a warrant. Stone pulled defendant over based on information he obtained at a meeting before going out on patrol. At the meeting, Werniak advised Stone and other officers of sexual assaults recently perpetrated in the community. The officers received information regarding S.J.'s description of her attacker's car and they viewed a photograph of defendant. While on patrol later that day, Stone observed a car matching the description and he stopped the vehicle. After Werniak arrived to confirm defendant's identity, defendant was transported to the police station. It is well-established that where there is probable cause, police may effect a warrantless arrest. *Sims*, 192 Ill. 2d 614-15. Since we have resolved defendant's arrest issue on other grounds, we need not address his argument that use of the investigative alert by police violates the Illinois Constitution. See *In re*

*Barbara H.*, 183 Ill. 2d 482, 491 (1998) (cautioning that as a general rule, courts of review do not "render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided").

¶ 57 Defendant's final contention is that this court should remand the matter for a *Krankel* hearing, where he filed a *pro se* motion claiming ineffective assistance of counsel and the trial court did not inquire into his claim. When a defendant raises a *pro se* claim of ineffective assistance of counsel, the trial court must conduct a preliminary inquiry into the claim to determine any potential merit. *People v. Roddis*, 2020 IL 124352, ¶ 35. Defendant must only bring the claim to the court's attention. *People v. Ayres*, 2017 IL 120071, ¶ 11. The trial court's failure to conduct an adequate inquiry requires remand of the cause to the trial court for a hearing. *Id.* ¶ 26.

¶ 58 Defendant raised his ineffective assistance claim in a posttrial motion. At a hearing on April 28, 2017, the trial court asked defendant if he was satisfied with his attorney. Defendant answered, "I'm mixed on that, your Honor." The trial court responded, "All right," and proceeded to defendant's sentencing. The court made no other inquiry into defendant's claim. The State agrees with defendant that remand is warranted for the trial court to conduct a preliminary inquiry into defendant's ineffective assistance of counsel claim. We therefore remand the matter for a preliminary *Krankel* hearing.

¶ 59                                    IV. CONCLUSION

¶ 60 For the foregoing reasons, we remand the matter to the trial court for the limited purpose of conducting a preliminary *Krankel* hearing on defendant's ineffective assistance of counsel claim. If the trial court subsequently determines that defendant's trial counsel provided ineffective assistance, then defendant is entitled to a new trial. See *People v. Vargas*, 409 Ill. App. 3d 790,

803 (2011). However, if the court denies defendant's motion after inquiry into his claim, the judgment of conviction and sentence shall be affirmed. *Id.*

¶ 61    Cause remanded with directions.

---

**No. 1-17-1400**

---

| | |
|---|---|
| **Cite as:** | *People v. Butler*, 2021 IL App (1st) 171400 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 11-CR-8449; the Hon. Carl B. Boyd, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Kathryn L. Oberer, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Louis C. Longhitano, Assistant State's Attorneys, of counsel), for the People. |

---