2022 IL App (2d) 200713
No. 2-20-0713
Opinion filed May 10, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-144 |
| JOSHUA C. SUGGS, | ) ) | Honorable Stephen L. Krentz, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices McLaren and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, defendant, Joshua C. Suggs, was found guilty of two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (2) (West 2020)). The two counts merged for sentencing purposes, and defendant was sentenced to two years' imprisonment. On appeal, defendant argues that defense counsel was ineffective for two reasons. First, counsel promised during his opening statement that the jury would hear testimony from police officers that defendant denied throwing a glass at the victim, but counsel never presented that testimony, thus negatively impacting defendant's case by allowing the State in its rebuttal argument to remark on counsel's failure. Second, counsel failed to object to the State's remarks in rebuttal argument that shifted the burden of proof to defendant, leaving the impression that defendant was responsible for the lack

of exculpatory evidence. We determine that defense counsel was not ineffective for either reason. Accordingly, we affirm.

¶ 2                                   I. BACKGROUND

¶ 3     Defendant was indicted on two counts of domestic battery. Count I alleged that defendant knowingly caused bodily harm to Eric Shaefer, defendant's stepfather, when defendant "threw a cup at [Eric], striking him in the right hand, causing bruising and redness." Count II differed from count I only in that it alleged that "defendant knowingly made physical contact of an insulting or provoking nature with Eric" when defendant "threw the cup at Eric."

¶ 4     Before defendant's one-day trial began, the State submitted its witness list, which named only three potential witnesses: Eric and Kendall County sheriff's deputies Lee Cooper and Scott Raughley.

¶ 5     Before impaneling a jury, the trial court asked whether any venire members knew any of the three witnesses, all of whom were present. The court also admonished the venire members that defendant is presumed innocent, that the State bears the burden of proof, and that defendant is not required to present any evidence on his behalf.

¶ 6     After the jury was impaneled, the trial court admonished the jury that (1) the burden of proof remains on the State, (2) defendant does not have to present any evidence, and (3) opening statements are not evidence but rather predictions about what the evidence will show. The court also admonished the jury that "[a]ny statement made by an attorney that is not later supported by the evidence should be disregarded."

¶ 7     The parties then proceeded with opening statements. Defense counsel's theory was that Eric, wanting defendant out of the house, concocted a story that defendant injured him. Counsel asked the jury to consider when the photographs of Eric's injuries were taken and the "possible

motivations might [Eric] have for making up an incident about [a] stepson who is living at his house as a matter of getting him out." Counsel also asked the jury "to take into consideration the testimony of both the officers, as well as [Eric], and draw your own conclusions as to what you believed [*sic*] happened." Counsel told the jury, "You'll hear testimony from the officers that when [defendant] was asked, did you throw a glass at [Eric], no. Repeatedly, no. I didn't do that."

¶ 8    Although the State listed three people on its witness list, only Eric testified. He stated that, on May 27, 2020, he lived in a house in Oswego with his wife, Kim (defendant's mother), and defendant. Defendant was living in the basement and had resided intermittently with Kim and Eric since he was a child. Defendant's daughter, who was a toddler, also stayed with the family frequently. Defendant did not pay any rent.

¶ 9    Around 6:15 p.m. on May 27, 2020, Eric returned home from work, changed his clothes, and planned to go outside to relax. While changing his clothes, Eric heard defendant yelling at Kim. The yelling was coming from the family room. Defendant was demanding to know how Kim spent all the money that she made. Eric proceeded to the family room. Eric could not go outside because defendant was blocking the entrance to the kitchen where the back door was located. So, Eric sat silently on the couch next to the front door.

¶ 10    Kim, wanting to exit the family room and go outside with defendant's daughter, asked defendant to let her through. Defendant did not move. Defendant yelled at Kim that she was encroaching on his personal space and repeatedly asked, "[W]ho does that, who does that, who comes into my space like this[?]"

¶ 11     At that point, Eric stood up from the couch and moved toward the front door. This placed Eric approximately eight feet from defendant and Kim. Defendant had a heavy glass in his hand.[1] Defendant threw the glass at Eric as hard as he could. The glass hit Eric's right hand, bounced off his chest, and fell on the carpeted floor.

¶ 12     Eric testified that the glass broke his finger and caused "a lot of pain." After defendant threw the glass, Eric saw defendant clench his fist and move forward as if to hit Eric. Eric ran out the front door and called 911. Four or five minutes later, Kendall County sheriff's deputies arrived.[2] While Eric remained outside, the deputies entered the home and arrested defendant. As he spoke to the deputies, Eric's fingers were in extreme pain because of the glass that struck them. Eric did not realize at the time that one of his fingers was broken. Although Eric told the police about his fingers hurting, he said nothing about chest pain. Eric also declined medical treatment and did not seek any medical attention that day.

¶ 13     The next day, May 28, 2020, Detective Kasey Stoch interviewed Eric and took photographs of Eric's hands. The photographs, which were admitted into evidence, show the tops of Eric's hands. Eric's right pinky and ring fingers appear slightly bruised and swollen. Eric said nothing to Stoch that day about chest pain.

¶ 14     After talking with Stoch, Eric went to the doctor to have his finger X-rayed. The doctor put defendant's fingers in a temporary splint, or soft cast, with ACE bandages. Eric said nothing to the doctor about chest pain.

---

[1] In photographs admitted at trial, the glass appears to be a tumbler-like glass.

[2] The evidence does not indicate how many officers arrived or whether Cooper and Raughley were among them.

¶ 15    The next day, May 29, 2020, Eric noticed some chest pain. Eric looked in the mirror and saw bruising to his left pectoral area. Eric told Stoch about the bruising. Eric took photographs, which were admitted at trial and show a quarter-sized bruise on Eric's left chest area.

¶ 16    Eric also testified that defendant had previously acted aggressively toward him. Eight months before the charged incident, Eric moved defendant's car without his permission so that he could take the garbage cans to the curb. Although Eric moved defendant's car back, defendant was angry that his car was moved without his permission. Defendant yelled at Eric, came at him, lifted him off the ground, and threw him down. Eric never notified the police about the incident or sought medical treatment.

¶ 17    Eric admitted that, when the incident occurred, he was tired of defendant living with him and Kim. Defendant did not appreciate either Eric or Kim, but Eric was more tired of defendant not appreciating Kim. Eric stated that he "made a point to notify the police *** that [defendant] also didn't pay rent." Although Eric did not give any examples, he stated that there had been "a lot going on," that "[i]t wasn't just, it wasn't just that day," and that "[t]here was a ton that led up to this." Since defendant threw the glass, Eric wanted defendant to stay away from the house because defendant created a volatile environment. Eric testified that he does not feel safe around defendant because defendant is violent.

¶ 18    Following Eric's testimony, the State rested, and defense counsel moved for a directed verdict. Counsel noted, among other things, that the State introduced no medical evidence to support Eric's testimony that defendant broke his finger when he threw the glass. Counsel asserted that, although the elements of the charge did not require such evidence, it would have corroborated Eric's claim of injury. Counsel also asserted that the wrapping of Eric's fingers in ACE bandages was not sufficient evidence that his fingers were hurt. The trial court denied the motion.

¶ 19    After the court accepted defendant's waiver of his right to testify, defense counsel asked the trial court "for five minutes *** to speak with [defendant] outside the presence of the courtroom, as far as calling any additional witnesses or not. I don't necessarily intend so, but if I can just speak with him briefly." After talking with defendant, defense counsel rested without presenting any evidence.

¶ 20    Before closing arguments began, the trial court admonished the jury that (1) an attorney's statements are not evidence, (2) the jury should disregard any attorney's statements that are not supported by the evidence or reasonable inferences therefrom, and (3) each juror should rely on his or her own recollection of the evidence.

¶ 21    In his closing argument, defense counsel reminded the jury that the State bore the burden of proving defendant's guilt beyond a reasonable doubt. Counsel then asserted that the jury "heard from literally one person saying, yeah, this happened." Counsel reviewed what Eric said about defendant and Kim's argument, noting that the jury "didn't hear from [Kim]." Counsel then addressed Eric's alleged injuries, asking the jury, "Did you see any medical records for [the injuries]? Hear from any doctors about that?" Although counsel told the jury that the State need not prove that defendant broke Eric's finger, counsel propounded, "[W]ouldn't it corroborate the fact that it actually happened? Wouldn't the testimony of [Kim], who is in the room, corroborate her husband's story about this actually happening? Did you get any of that? No." When discussing whether there was evidence that the bruise on Eric's chest existed before the incident, counsel reiterated that the jury "just heard from [Eric], the only one saying, yeah, this happened." Counsel then asserted:

"Did you hear about any police officers talking about what [defendant] was like when they arrived? No. Once again, did you hear from [Kim]? No. Did you hear from a doctor about a broken finger? Did you see any medical records? No.

And the State wants to contend that this is proof beyond a reasonable doubt. Ladies and Gentlemen, it's not. One person saying, yeah, it happened ***. ***

[Defendant] is not required to prove to you anything. The State has certainly not met their [*sic*] burden and not presented the additional corroborating evidence that would convince you.

Simply put, this is not enough. [Eric] saying, yeah, he did it. That is not enough."

¶ 22 In rebuttal, the State first commented on the promise defense counsel made in his opening statement. It asserted:

"Remember opening statements? You will hear evidence the defendant said, no, I didn't do that. Remember that? I'm trying to remember which part of [Eric's] testimony supports what counsel said the evidence was going to show.

Did anyone hear that, at any time during the course of this trial? The defendant said, I didn't do it? You want to talk about what you didn't hear, that's a great example."

The State continued by observing that defense counsel stressed numerous times that the jury heard from only one person, Eric. The State noted that defense counsel "[m]ade it a point to talk about how you didn't hear from [Kim], the blood relative of [defendant]." After commenting on defendant's rights—including the presumption of innocence and the right to make the State prove his guilt beyond a reasonable doubt—the State addressed defendant's subpoena power. The State stressed that defendant had "[t]he power to make [Kim] come in here if she doesn't want to, to tell you what happened." The State continued, "Who do you think the blood relative of [defendant] is

going to help? The [State] or [defendant], if she were here to testify?" The State then addressed the fact that only Eric testified and there was no corroborating evidence. The State asserted that "[t]here's no law that says you need more than one witness" and "[t]here is no law that says, we need to corroborate what [Eric] told you during the course of this trial." The State then commented on the lack of medical evidence:

"Again, the defense has absolutely no burden of proof, none at all, but they have a right to present it if they want to. No burden. And I want to make that clear. But how easy would it be to get someone from [the hospital] to say, we never saw [Eric] here. I don't know what you're talking about."

The State then addressed defense counsel's assertion that the jury did not hear from any police officers:

"Counsel asks rhetorically, we didn't hear from any police officers to talk about how [defendant] was after the incident, when police are there. Why? What are they going to tell you that's going to shed any light on what happened in that room? The crime [*sic*] has already been committed."

The State never commented about the police indicating whether defendant committed the crimes. Also, defense counsel did not object to anything the State said in rebuttal.

¶ 23    After the jury found defendant guilty of both counts of domestic battery, defendant filed a motion for a new trial. In that motion, defendant did not challenge the State's rebuttal argument or counsel's effectiveness. Defendant moved the court to reconsider the sentence, the court denied the motion, and this timely appeal followed.

¶ 24                                    II. ANALYSIS

¶ 25    At issue in this appeal is whether defense counsel was ineffective. Although ineffective-assistance claims are generally subject to a bifurcated standard of review (*People v. Davis*, 353 Ill. App. 3d 790, 794 (2004)), our review here is *de novo* because defendant did not raise counsel's ineffectiveness below and, thus, the trial court made no findings of fact to which we must defer (*People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24).

¶ 26    A criminal defendant's right to the effective assistance of defense counsel is guaranteed by both the United States Constitution (U.S. Const., amend. VI) and the Illinois Constitution (Ill. Const. 1970, art. I, § 8). *People v. Briones*, 352 Ill. App. 3d 913, 917 (2004). If a defendant believes that that right has been violated, he may challenge defense counsel's effectiveness by proving that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defendant. *Id.* "To establish deficiency, the defendant must overcome the strong presumption that counsel's challenged action or inaction was the product of sound trial strategy." *Id.* That is, the defendant must show that his counsel made errors so serious that the defendant was denied his constitutional right to counsel. *Id.* "To show prejudice, the defendant must establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* A reasonable probability is one that is sufficient to undermine confidence in the case's outcome. *Id.* "Failure to establish either prong is fatal to the claim" that counsel was ineffective. *People v. Pineda*, 373 Ill. App. 3d 113, 117 (2007).

¶ 27    That said, a defendant has the right to competent, not perfect, representation. *Briones*, 352 Ill. App. 3d at 917. "Only the most egregious of tactical or strategic blunders may provide a basis for a violation of a defendant's right to the effective assistance of counsel [citation], such as when [defense] counsel's chosen strategy was so unsound that counsel completely failed to conduct any meaningful adversarial testing [citation]." *Id.* at 918.

¶ 28   Defendant argues that defense counsel was ineffective in two respects. First, counsel promised during opening statement that the jury would hear testimony from police officers that defendant denied throwing a glass at Eric, but counsel never presented that testimony, thus negatively impacting defendant's case by allowing the State to comment in rebuttal on counsel's failure. Second, counsel failed to object to the State's remarks in rebuttal argument that shifted the burden of proof to defendant, leaving the impression that defendant was responsible for the lack of exculpatory evidence. We address each argument in turn.

¶ 29                    A. Opening Statement Promise

¶ 30   First, we consider whether defense counsel was ineffective for promising during opening statement that the jury would hear testimony from police officers that defendant denied throwing a glass at Eric. Generally, defense counsel's failure to present promised testimony to the jury is "highly suspect." *People v. Gunn*, 2020 IL App (4th) 170653, ¶ 37. This is so because, once defense counsel makes that promise, the jury expects to hear that testimony, and if that testimony is not presented, the jury may very well infer not only that defense counsel is incredible but also that the promised testimony would have damaged the defendant's case. *Id.* However, courts have recognized that defense counsel's failure to present promised testimony can be excused when the failure results from unforeseen events (*Briones*, 352 Ill. App. 3d at 918) or where a change in the defense results from a plausible strategic decision (*People v. Bryant*, 391 Ill. App. 3d 228, 239 (2009)).

¶ 31   Here, the record suggests that defense counsel's failure to present testimony from the officers that defendant denied throwing a glass at Eric resulted from unforeseen events that caused defense counsel to strategically change tactics. Right before the trial began, the State submitted its witness list as required by Illinois Supreme Court Rule 412(a)(i) (eff. Mar. 1, 2001). On that list

were two deputies from the Kendall County Sheriff's Office. Defense counsel evidently believed that these deputies were the officers who responded to the scene; counsel would have learned this from incident reports produced in discovery. The record shows that the deputies were in court when the jury was impaneled. Later, in opening statement, counsel told the jury that they would "hear testimony from the officers" that defendant denied throwing a glass at Eric. Nothing in the record suggests that the deputies were not also in court during opening statements; in fact, their presence would not be surprising given that the trial was scheduled for only one day. Given that the deputies were on the State's witness list and presumably were in court when defense counsel gave his opening statement, it was reasonable for defense counsel to expect the State to present the deputies' testimony. Counsel could not have foreseen that the State would not call the deputies and thus give counsel the chance to cross-examine them and elicit testimony that defendant denied throwing a glass at Eric.

¶ 32 We stress that, contrary to defendant's intimation in his reply brief, the State's failure to call the deputies did not place any burden on counsel to call them simply so that counsel could keep his promise. Indeed, although nothing prevents defense counsel from calling officers listed on the State's witness list (see *People v. DeLeon*, 40 Ill. App. 3d 308, 312 (1976)), a defendant generally is prohibited from calling a witness to testify about the defendant's own self-serving hearsay statements (see *People v. Harman*, 125 Ill. App. 3d 338, 341 (1984)). Defendant's denial to the deputies that he threw a glass at Eric would certainly be a self-serving statement, as the glass was what Eric claimed caused his injuries. Because the State did not call the deputies, defendant could not elicit from them that defendant denied harming Eric. Even assuming defense counsel could have called the deputies—an assumption we do not make—it certainly is not difficult to see why counsel changed his strategy and chose not to call the deputies when the State chose not to

call them. One reason is that the deputies arrested defendant for domestic battery. Because there was no physical evidence directly implicating defendant as the perpetrator, the probable cause the deputies possessed to arrest defendant most certainly arose after they spoke to Eric, defendant, and presumably Kim. See *People v. Butler*, 2021 IL App (1st) 171400, ¶ 41 (the police must have probable cause to make an arrest). Calling the deputies solely to testify that defendant denied harming Eric would have gained defendant little yet cost him a great deal, as it would have opened the door for the State to cross-examine the deputies about what they learned at the scene that caused them to arrest defendant for domestic battery.[3]

¶ 33    Moreover, we stress that the trial court admonished the jury—with some admonishments repeated—that opening statements (1) are not evidence, (2) consist merely of what the attorneys anticipate the evidence will show, and (3) must be disregarded to the extent that the evidence does not support them. While such admonishments are not necessarily curative, they are at least a factor to consider in deciding whether the defendant was prejudiced when promised evidence was not presented. See *Gunn*, 2020 IL App (4th) 170653, ¶ 37.

¶ 34    Based on the foregoing, we hold that defendant's performance was not deficient and that, even if it were, defendant was not prejudiced given the trial court's admonishments and Eric's

---

[3] As an aside, we observe that, before the defense rested, counsel talked with defendant about calling defense witnesses. After the conversation, counsel reported to the court that the defense was resting. Defendant himself said nothing to the trial court about calling the deputies or other witnesses. We construe that silence against defendant.  See *People v. Harris*, 389 Ill. App. 3d 107, 133 (2009) ("[I]t is the defendant's burden to overcome the presumption that a decision to not call a witness is within the realm of trial strategy.").

testimony, which was sufficient to establish defendant's guilt. See *People v. Vassar*, 62 Ill. App. 3d 523, 526 (1978) ("[T]he testimony of one credible witness is sufficient for the trier of fact to conclude that defendant had been proved guilty beyond a reasonable doubt.").

¶ 35    Relying on *People v. Lewis*, 240 Ill. App. 3d 463 (1992), defendant argues that defense counsel's broken promise constituted deficient performance, especially because defense counsel offered no strategic reason for failing to call the officers. We disagree. In *Lewis*, the defendant was convicted of two counts of murder. *Id.* at 464. The evidence at the jury trial revealed that the defendant and a codefendant were responsible for the murders. *Id.* at 466-67. Defense counsel's theory in opening statement was that the defendant was not liable for either murder, because (1) the defendant stabbed one of the victims, but the codefendant delivered the fatal stab wound, and (2) the defendant was not involved in the other killing. *Id.* at 467-68. Counsel asserted that the defendant's pretrial statement, made in police custody, supported the defense theory. *Id.* at 467. The State never offered defendant's pretrial statement into evidence, and when the defense counsel attempted to introduce the statement, the trial court ruled that the statement was inadmissible. *Id.* at 468. Defense counsel again referred to the defendant's pretrial statement in closing argument. *Id.* The State objected, and the trial court sustained the objection. *Id.*

¶ 36    On appeal, the defendant argued that defense counsel was ineffective for "basing his defense on [hearsay] evidence which [counsel] could not and did not produce to the jury." *Id.* at 467. The appellate court agreed that this constituted ineffective assistance. *Id.* at 468. In doing so, the court observed that (1) "[i]t is well settled that a defendant's post-arrest, custodial statement offered in his own favor is not admissible and is subject to objection on hearsay grounds" and (2) "the promise to produce such significant exonerating evidence and the failure to fulfill such promise is highly prejudicial." *Id.*

¶ 37 Here, unlike in *Lewis*, the State, not defendant, would have sought to present testimony from the deputies, who were listed on the State's witness list. Although, like in *Lewis*, defendant's theory here was that he did not commit the crime, defendant's theory was based not on his statement to the deputies but on (1) weaknesses in the State's proof of Eric's injury and (2) evidence of Eric's motive to expel defendant from the house. Defendant's denials to the police were, at most, consistent with the defense theory; thus, the promised evidence here was not the basis for the defense theory, unlike in *Lewis*.

¶ 38 Additionally, although, like in *Lewis*, defendant's statement to the police that he did not throw a glass at Eric was hearsay, nothing suggests that the statement would be inadmissible on cross-examination of the officers. If the State had called the deputies to testify to their interaction with defendant at the scene, defense counsel would have been allowed under the completeness doctrine to ask the deputies about the denials defendant made when they questioned him, as doing so would have prevented the jury from being misled into thinking that defendant said nothing when the deputies confronted him. See *People v. Weaver*, 92 Ill. 2d 545, 556-57 (1982) (after a neighbor testified that the defendant knocked on her door in a panic and stated that there was a fire and that two men were in her house with guns, the defendant—who was charged with murdering her husband—should have been allowed to elicit testimony on cross-examination of her neighbor that she told her neighbor that the two men killed her husband). Thus, counsel had reason to believe that the State would call the deputies *and* that he could elicit their testimony that defendant denied throwing a glass at Eric.

¶ 39        B. No Objection to Statements Made in Rebuttal

¶ 40 Next, we consider whether defense counsel was ineffective for failing to object during the State's rebuttal argument that the State shifted the burden of proof to defendant. Generally, the

decision whether to object to statements made in closing argument is a matter of trial strategy and does not establish ineffective assistance. *People v. Beard*, 356 Ill. App. 3d 236, 244 (2005). Nonetheless, because a defendant " 'is under no obligation to produce any evidence, *** the [State] cannot attempt to shift the burden of proof to the defense' " by arguing that the defendant failed to present evidence. *People v. Curry*, 2013 IL App (4th) 120724, ¶ 80 (quoting *People v. Beasley*, 384 Ill. App. 3d 1039, 1047-48 (2008)). Indeed, "it is reversible error for the [State] to attempt to shift the burden of proof to the defense." *People v. Leger*, 149 Ill. 2d 355, 399 (1992).

¶ 41    However, the State's comment on a defendant's failure to produce evidence does not always constitute burden shifting. *People v. Jackson*, 399 Ill. App. 3d 314, 319 (2010). Rather, where the defendant attacks in closing the State's failure to produce evidence to which the defendant had equal access, the State may respond by commenting on the defendant's own failure to produce that same evidence. *Id.* There is no reversible error when the statements the State made in rebuttal were invited by statements the defendant made in his closing argument. *People v. Nieves*, 193 Ill. 2d 513, 533-34 (2000).

¶ 42    Defendant argues that the State improperly shifted the burden of proof in two ways. First, the State suggested that defendant would have called Kim (his mother and an eyewitness to the incident) if defendant truly did not throw a glass at Eric. Second, the State noted that defendant did not produce evidence rebutting Eric's claim that he sought medical treatment for his injuries. Defendant argues that counsel's failure to object to these comments constituted ineffective assistance. We disagree.

¶ 43    The State's comments in rebuttal concerning defendant's failure to produce evidence were invited by defense counsel's comments in closing argument. More specifically, we conclude that the State's comments were a proper response to counsel's statement that the State failed to call

Kim or produce medical evidence to corroborate Eric's testimony. Thus, since there was no basis for counsel to object to the State's comments, counsel's failure to object was not deficient performance. See *People v. Rogers*, 2021 IL 126163, ¶ 32 ("Counsel cannot be considered ineffective for failing to make or pursue what would have been a meritless motion or objection."). Moreover, to the extent that the State's comments were improper, there was no prejudice to defendant given (1) the parties' comments, and the trial court's admonishments and instructions, that the State bore the burden of proof and (2) the trial evidence, which was sufficient to convict defendant.

¶ 44    Instructive on our position is *People v. Kliner*, 185 Ill. 2d 81 (1998). There, although the State in rebuttal noted that it had the burden of proving defendant's guilt beyond a reasonable doubt, it commented that the defendant had the power to subpoena witnesses or documents and that the defendant would have utilized this power to support his innocence if such evidence were available. *Id.* at 152-53. After closing arguments, the trial court instructed the jury that the State bore the burden of proving defendant's guilt beyond a reasonable doubt and that the defendant was not required to prove his innocence. *Id.* at 153. Our supreme court determined that, in the context of proceedings, the State's comments were not improper "because they were based on reasonable inferences drawn from the evidence or invited by the closing arguments [*sic*] of defense counsel." *Id.*

¶ 45    Similarly, the State's comments here were not improper in context. Like in *Kliner*, the State's comments about defendant's ability to exercise his subpoena power and present any evidence establishing his innocence were invited by defense counsel's closing argument. *Id.* Further, as in *Kliner*, the State reminded the jury that the State had the burden of proving defendant's guilt beyond a reasonable doubt and that the defendant had no burden (here defense

counsel, too, gave the same reminder). *Id.* at 152; see also *People v. Vinson*, 61 Ill. App. 3d 684, 689 (1978) (remarks the State made in closing, which may have tended to shift the burden of proof in the minds of the jurors, did not require reversal of the defendant's conviction, because the State's "remarks were offset by the prosecutor himself when he stated several times in closing argument that the State carried the burden to prove the defendant guilty beyond a reasonable doubt"). Finally, like in *Kliner*, the trial court here admonished and instructed the jury about the State's burden of proof to make it clear that the State could not shift the burden of proof to the defendant. *Kliner*, 185 Ill. 2d at 153; see also *People v. Bell*, 113 Ill. App. 3d 588, 601 (1983) (the State's comment tending to lessen the importance of its burden of proof was not reversible error, "because the jury was properly instructed on the [State's] burden of proof, and the [State's] comment did not negate these instructions or shift the burden of proof to the defendant[ ]").

¶ 46 Accordingly, we determine that defense counsel's failure to object to the State's comments about defendant's ability to present exculpatory evidence was not ineffective assistance. Not only was counsel's performance not deficient, but there was no prejudice to defendant given (1) the parties' comments and the trial court's instructions clarifying where the burden of proof lay (*Kliner*, 185 Ill. 2d at 152-53) and (2) the evidence at trial, which, though consisting only of Eric's testimony, was sufficient to establish defendant's guilt beyond a reasonable doubt (*Vassar*, 62 Ill. App. 3d at 526).

¶ 47                          III. CONCLUSION

¶ 48 For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 49 Affirmed.

**No. 2-20-0713**

| | |
|---|---|
| **Cite as:** | *People v. Suggs*, 2022 IL App (2d) 200713 |
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 20-CF-144; the Hon. Stephen L. Krentz, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Zachary Wallace, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Eric C. Weis, State's Attorney, of Yorkville (Patrick Delfino, Edward R. Psenicka, and John G. Barrett, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |