2026 IL App (2d) 240711-U
No. 2-24-0711
Order filed April 9, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v. ROBERT A. SMITH, Defendant-Appellant.

Appeal from the Circuit Court of Lake County.
Honorable George D. Strickland, Judge, Presiding.
No. 11-CF-2826

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court did not err in denying defendant's postconviction petition, where (1) trial counsel was not ineffective for (a) failing to challenge ballistics evidence or (b) making unfulfilled promises in opening statements; (2) appellate counsel was not ineffective for failing to raise a plain-error *Zehr* argument on direct appeal; (3) postconviction counsel did not provide unreasonable assistance by failing to correct the court's misapprehension of law; and (4) defendant did not establish multiple errors that cumulatively deprived him of a fair trial. Affirmed.

¶ 2   Defendant, Robert A. Smith, appeals from the circuit court's order denying, after a third-stage hearing, his petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4                              A. Trial and Direct Appeal

¶ 5    A detailed recitation of facts may be found in our prior decision resolving defendant's direct appeal. *People v. Smith*, 2015 IL App (2d) 130246-U. However, for context relevant to the issues raised in this appeal, we recount that, on August 5, 2011, at around 3 p.m. in North Chicago, Phillip Taylor was driving a maroon vehicle with passengers Larry Bone and Geno Adams. A vehicle pulled up next to the passenger's side of Taylor's car, and gunshots were fired. Taylor was shot in the head and killed, and Bone, who was sitting in the back seat, was shot in his wrists. Defendant was ultimately charged with first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) and aggravated battery with a firearm (*id.* § 12-3.05(e)(1)). *Smith*, 2015 IL App (2d) 130246-U, ¶ 5.

¶ 6    The State's theory was that, a few days before the murder, defendant was present at a Speedway gas station, driving his white Grand Prix. Bone and Adams were also at the gas station, gunshots were fired, and defendant's girlfriend's brother was shot and injured. Therefore, the State argued that defendant, seeking revenge, intended to kill Bone or Adams on August 5, 2011, but Taylor was killed. According to the State, defendant then took the murder weapon, which he also used at the gas station, to his mother's (Cynthia Mendez's) house and gave it to her boyfriend, James Charleston, to hide. *Id.* ¶ 6. Police recovered the weapon. A firearms examiner and expert, Gary Lind, testified at trial that he compared shell casings found at both the gas station shooting and murder scene with the .380-caliber weapon recovered, and he concluded based upon a reasonable degree of scientific certainty that the .380-caliber casings found at both scenes were fired from the recovered gun. *Id.* ¶ 46. While Lind testified that the bullet cores retrieved from Taylor's head and the driver's seat back cushion could not be compared to the gun, they were consistent in size with being fired from a .380-caliber weapon. *Id.* On cross-examination, Lind agreed that he also looked at .45-caliber casings that were found at the murder scene, but they did not match any firearm he was provided in this case. He also agreed that one recovered bullet

lacked its copper jacket and, thus, the diameter of the bullet core could also be consistent with a 9-millimeter bullet. Finally, defense counsel confirmed with Lind that he also processed the white Grand Prix. Lind agreed that, when a gun fires inside a car, gun power residue is likely to be found somewhere inside the vehicle; nevertheless, the Grand Prix was in a "clean state," and no gun powder residue was detected.

¶ 7    Defendant claimed that he was innocent. In addition to denying his involvement, defendant offered his own theory of the August 5, 2011, shooting, noting that another person, Roderick Golden, had been charged with and convicted of trying to solicit Adams's murder. He implied that Golden or another person acting on Golden's behalf committed the shooting, and that Adams was the target. Defendant further implied that Charleston and Golden, both around the same age and "career criminals," could have connections. Defendant argued that the police never investigated that lead, and, at trial, detective Donald Florance confirmed that (1) Golden was convicted of trying to hire an undercover officer to murder Adams; and (2) there was no investigation into whether Golden had anything to do with the August 5, 2011, shooting or possible connections between Charleston and Golden. *Id.* ¶ 47. Defendant noted that Charleston had, at one point, stated that the gun was his and that he bought it in March 2011 and hid it prior to the August shooting. Also, defendant presented evidence that Charleston had occasionally driven the white Grand Prix. Finally, defendant argued that the gunshots came from a black car, not a white Grand Prix. *Id.* ¶ 7.

¶ 8    In opening statements, defense counsel stated, "You are going to hear from [defendant]." Further, after explaining that defendant turned himself in and agreed to speak with police in a videotaped interrogation, counsel stated, "And you're going to hear him say he did not—was not involved in this. You're going to hear the police yell at him. You're going to hear him keep his cool and say that he did not do this." Additionally, counsel promised in opening statement that the

jury would hear evidence reflecting ties between Charleston and Golden, who had been convicted of trying to kill Adams. However, defendant's recorded interrogation was not presented at trial, defendant did not testify at trial, nor was evidence received establishing ties between Charleston and Golden. Later, in a discussion outside of the jury's presence, the State commented to the court that it was inclined to have a detective testify about defendant's statements, but not introduce the video of the interrogation, although defense counsel wanted the video introduced. The court told defense counsel he could introduce the video in defendant's case, as the State could introduce its evidence as it saw fit. Defense counsel commented, "My only issue—my only issue is that I commented on the video because [the assistant State's Attorney] told me he was going to put it in at the beginning of the trial, and I don't want you to hold that against me in my closing."

¶ 9    In closing arguments, the State noted for the jury that it could ignore Charleston and Bone and find defendant guilty based upon the surveillance videos and ballistics evidence. "Look at the surveillance videos. Look at the ballistics. Look at the tool marks. This defendant based upon that alone is guilty." *Id.* ¶ 59. The State commented that the jury did not need to find Bone or Charleston credible because "[t]his is a CSI case." During deliberations, the jury asked the court three questions, including, as to ballistics, "Are there any .380[-]caliber bullets in the maroon car that have intact casings to directly link to the .380[-]caliber gun? Requesting forensic evidence tying directly to the gun." The court instructed the jury that it had received all the evidence and should continue deliberations. Ultimately, on October 17, 2012, the jury found defendant guilty of first degree murder and aggravated assault with a firearm. The trial court sentenced defendant to an aggregate term of 45 years' imprisonment.

¶ 10    Defendant raised five overarching arguments on direct appeal, which we rejected. First, while we agreed with defendant that other-crimes evidence surrounding the gas station shooting

should not have been admitted for purposes of establishing motive, we concluded that the evidence was properly admitted for purposes of establishing identity. *Smith*, 2015 IL App (2d) 130246-U, ¶¶ 75-76. Second, we agreed with defendant that the court should have substantively admitted portions of Charleston's inconsistent statement (namely, in contrast to his police statement and testimony at trial, Charleston signed a sworn affidavit that the gun was his and defendant had not asked him to hide it); however, we concluded that the error was harmless because the evidence supporting the verdict remained overwhelming. *Id.* ¶¶ 81-85. Specifically, we explained,

"even setting aside both Charleston's testimony and statement, the evidence nevertheless overwhelmingly supported defendant's guilt. For example, although not the State's primary theory at trial, the evidence supporting defendant's conviction based on an accountability theory did not at all hinge upon Charleston's testimony. Specifically, even without Charleston's testimony, there is no reasonable probability that the jury would have acquitted defendant, given the following evidence supporting the State's theory that defendant was a participant in the common design to commit the offense: (1) Mendez testified that she owned a white Grand Prix and that defendant drove the vehicle; (2) the Midwest Bank surveillance video from August 5, 2011, depicted a white Grand Prix traveling directly behind Taylor's car; (3) Bone testified that a white, four-door Grand Prix pulled alongside Taylor's car; (4) Bone identified defendant as the driver of that white Grand Prix, explaining that he recognized defendant and the vehicle from the Speedway shooting one week earlier; (5) Bone testified that both defendant and another person in the back seat of the Grand Prix were holding guns and fired shots; (6) Adams testified that at least two people were present in the white car and that gunshots were fired from both the front and back windows of the vehicle; (7) the bullets recovered were fired from .38-caliber

and .45-caliber weapons; (8) the bullets recovered from Speedway included an unspent .38-caliber bullet that was fired from the same weapon as the .38-caliber bullets recovered from the August 5, 2011, shooting; and (9) the Speedway surveillance video depicted a person wearing a white tank top, *i.e*., the same clothes defendant was wearing a short time later when interviewed by [detective Larry] Holman at the hospital.  Accordingly, although Charleston's trial testimony was damaging in that it linked defendant to the .38-caliber weapon used in the murder, there remained overwhelming evidence *completely independent from Charleston* to support defendant's guilt as a participant in the crime, regardless of the weapon he used."  (Emphasis in original.)  *Id.* ¶ 83.

Third, we also rejected defendant's argument that an officer improperly identified defendant in photographs taken from the gas station's surveillance video.  *Id.* ¶¶ 89-93.  Fourth, we held that, even though the State had not charged felony murder, the evidence supported the jury's receipt of a felony-murder accountability instruction.  *Id.*  ¶¶ 99-103.  Finally, we rejected defendant's cumulative error argument.  *Id.* ¶ 105.

¶ 11                                      B. Postconviction Proceedings

¶ 12                                      1.  Postconviction Petition and Hearing

¶ 13     In 2016, defendant, with the assistance of counsel, filed a postconviction petition that advanced to the second stage.  In 2019, counsel amended the petition, raising four issues.

¶ 14     First, defendant argued that trial counsel was ineffective where he did not challenge the State's ballistics and firearms analysis, as testified to by firearms examiner Lind.

¶ 15     Second, defendant argued that trial counsel was ineffective where, in opening statements, he promised the jury that it would hear evidence from defendant, specifically, "You are going to hear from [defendant]."  Further, after explaining that defendant turned himself in and agreed to

speak with police in a videotaped interrogation, counsel stated, "And you're going to hear him say he did not—was not involved in this. You're going to hear the police yell at him. You're going to hear him keep his cool and say that he did not do this." Additionally, defendant argued that counsel promised in opening statements that the jury would hear evidence reflecting ties between Charleston and Golden, who had been convicted of trying to kill Adams. Nevertheless, counsel's promises remained unfilled, where defendant did not testify, his interrogation video was not introduced, and no evidence established Charleston's alleged ties to Golden. Defendant further alleged that appellate counsel was ineffective for failing to raise this issue on direct appeal.

¶ 16    Third, defendant argued that the court violated Illinois Supreme Court Rule 431(b)(4) (eff. May 1, 2007), where it did not ask potential jurors whether they understood and accepted the principle that a defendant's decision not to testify cannot be held against him. See *People v. Zehr*, 103 Ill. 2d 472 (1984). Defendant argued that the failure constituted reversible error, where the evidence was closely balanced and where trial counsel had promised the jury that defendant would testify, but he did not.

¶ 17    Finally, defendant argued that the cumulative effect of the foregoing errors deprived him of a fair trial.

¶ 18    The petition advanced to a third-stage evidentiary hearing, which focused on the first issue raised in the petition, *i.e.*, trial counsel's failure to challenge the State's firearms and ballistics evidence. Defendant called William Tobin, an expert in forensic metallurgy and material science. Tobin has testified as an expert witness over 300 times, many times for the State. Among other experience, for 24 years, Tobin worked for the Federal Bureau of Investigations (FBI) as a forensic metallurgist, which included frequent work with firearms examination and toolmark analysis. Tobin testified that he has extensively studied and published multiple papers regarding the

- 7 -

assumptions and premises of firearm toolmark identification. Tobin's nine-page curriculum vitae was admitted into evidence.

¶ 19 Tobin testified to his opinion that firearms toolmark identification lacks foundational validity and relies on flawed methodology of unproven and contradictory assumptions, and, thus, courtroom identifications lack probative value. In this case, Tobin reviewed: (1) the standard operating procedures used by the crime lab; and (2) transcripts of Lind's testimony. He testified that he had "serious issues" with Lind's methodology, and he stated that Lind's testimony reflected that he exceeded the set bounds of acceptability within his own domain and that "part of his testimony is now no longer even allowed" (*i.e.*, opining in this area that something is a "match" or opining to a "reasonable degree of scientific certainty"). At the time of trial, Tobin explained, the strongest opinion that was scientifically and forensically defensible was that a "specific firearm could not be eliminated as the firing platform." Tobin testified that, for seven reasons, firearms identification is not a science but, rather, the practice is "100 percent subjective. It's not partially subjective. It is entirely subjective, and that's exactly what the scientific method was designed to mitigate or eliminate."

¶ 20 To the extent that Lind opined to the jury at that, under the methodology he used, he could determine that bullets or casings were fired from a particular firearm, Tobin did not agree that Lind could make that conclusion, responding, "No, for very many reasons, but unequivocally no." In sum, he explained, the firearms identification process is based on flawed methodology, in part because there are three characteristics in firearms: (1) class (intentional characteristics shared by all firearms in that class, such as caliber, shape of the firing pin, or the number of grooves in the barrel); (2) subclass (characteristics acquired incidentally during the manufacturing process that are shared by all firearms in the same production lot); and (3) individual (characteristics that belong

to a specific firearm and only that firearm). As an example of subclass characteristics, Tobin testified that Smith & Wesson makes 2,000 9-millimeter semiautomatic pistols per day, so "those subclass characteristics would belong to every one of those 2,000[.]" Nevertheless, Tobin testified that examiners "almost always" ignore subclass characteristics and misidentify them as individual characteristics, when "there is no known method by which an examiner can discern the difference between subclass characteristics and purportedly individual characteristics." Tobin demonstrated his point by referring to an image in a PowerPoint presentation, explaining that the image reflected two bullets under a comparison microscope with virtually indistinguishable striations. "I don't find any salient dissimilarities," but they were, in reality, fired by two different weapons and contain characteristics that belonged, at a minimum, to every other firearm in the same production lot. Tobin explained various professional and published concerns about firearms identification processes, guidelines, and standards. He opined that Lind's conclusions were, essentially, speculative and intuitive.

¶ 21    The court asked Tobin several questions. Namely, the court confirmed that the FBI continues to practice firearms identification and that, although Tobin believes the FBI's firearm examiners are some of the best in the world, his testimony was that they are not scientists and there is no foundational validity for their opinions. The court confirmed that the Association of Firearm and Toolmark Examiners (AFTE) is comprised of around 1,200 worldwide members, including agents from the FBI, the Alcohol, Tobacco, and Firearms Agency (ATF), and state crime labs throughout the nation, but Tobin believed that they are "incorrect and that their theories are circular, vague, [and] without meaning." When the court summarized that it sounded as if there were hundreds, if not thousands, of expert witnesses in firearms toolmark analysis that were "just all wrong and that you're right," Tobin answered, in short, "yes."

¶ 22    The court asked Tobin whether he could cite any Illinois cases finding firearm analysis unreliable, and Tobin recounted a Cook County circuit court case issued February 8, 2023.  Then, the court asked, "So did you actually compare the projectile and the gun in this particular case that Mr. Lind testified about?" and Tobin replied, "No."  As such, he agreed with the court that he did not know if they were consistent, as he did not actually compare the firearms. Tobin agreed that an examiner could defensibly opine that there were no inconsistencies between a shell casing and a firearm.  Finally, the court referred to the image that Tobin had referenced showing two images that showed virtually no salient inconsistencies but were fired from two different weapons; the court identified with Tobin inconsistencies in the images.  Tobin explained that the problem was that an examiner could simply decide which striations he or she wished to use to form an identification and ignore the dissimilarities, which is similar to handpicking data to support an opinion.

¶ 23    The court confirmed that Tobin has testified for the defense 65 times since 2008 or 2009, and a defense attorney would find him by word of mouth because he does not pay to advertise.  By word of mouth, he would include publications, colleagues, and coauthors in a significant number of publications, including some by other researchers starting around 2002.

¶ 24    On cross-examination, Tobin confirmed that he was being paid roughly $6,000 for his consultation.  He does not have degrees or additional coursework in forensic firearms identification and, although he examined "tens of thousands of firearms" while working at the FBI, he was not a designated firearms examiner.  Tobin agreed that firearms examination can be both effective and probative in comparing similarities and for feature comparison and pattern matching practices.

¶ 25    The State called Lind to testify.  Lind first became aware of Tobin "approximately 10 years ago."  Lind disagreed with Tobin's opinions that firearms identification is not a science and that

examiners ignore subclass characteristics. Lind testified that, when performing analyses, he discerns the difference between subclass and individual characteristics, and he disagreed with Tobin that uniqueness in firearms does not exist. Lind further disagreed with Tobin that firearms identification is entirely subjective. Rather, he acknowledged that some aspects are subjective, but testified that, overall, the science is objective by making observations, recording observations, and then subjectively rendering an opinion. Further, the field combats the subjective potential of firearms identification through a verification process, whereby a second examiner reexamines the evidence and, if consensus is reached, a report will then be issued. Additionally, there are accreditation processes and standard operating procedures. "[T]he verification process is a very necessary process in this science and in forensic science to mitigate errors from leaving the laboratory." When Lind reviewed the evidence in this case, the laboratory utilized the standards discussed. Further, he did not note any subclass characteristics, such as mold marks or long continuous striae, in the evidence examined in this case. The evidence was also put into the Integrated Focus Fix Identification System (IFFIS), a system provided by ATF, which takes two- and three-dimensional pictures of discharged cartridge casings and, based upon class characteristics, compares them to other database entries. Those results would include subclass characteristics. Upon system review of the evidence in this case, there was no indication of subclass characteristics. In addition, another forensic firearms examiner independently reviewed the evidence in this case; the opinion of that independent examiner was the same as Lind's, and, thus, the repeatability verification was reached by obtaining consensus.

¶ 26                        2. Court's Ruling Denying the Petition

¶ 27    On October 25, 2024, the court denied defendant's postconviction petition. It first rejected arguments concerning the trial court's failure to ask the jury, in compliance with Rule 431(b),

whether it understood and accepted that a defendant's decision not to testify cannot be held against him. Indeed, the court had interrupted postconviction counsel's closing argument on this point, stating that there can be no plain error on this issue when defense counsel did not ask the trial court to provide the instruction. Further, the court stated, "That question is only to be asked *** the rule states that specifically only on request by the defense. There's no case that says the defendant does not ask for that that it is plain error." Counsel responded, "I am not going to disagree with your honor." The court replied, "I am telling you that's what the rule is." In accordance with that position, the court rejected the petition's argument, noting again that there is no plain error regarding the fourth *Zehr* principle where trial counsel did not request it. The court determined that, while the first three *Zehr* questions are not optional, the last question is left to the defense attorney, "it's a strategic issue. It's entitled to deference." In any event, the court noted, the jury was instructed that the fact that defendant did not testify could not in any way be considered by it. Thus, the court found no ineffective assistance because trial counsel's failure to request the fourth principle was strategy and, further, there was no evidence that the result would have been different, had the question been asked.

¶ 28 Next, regarding the petition's arguments concerning trial counsel's unfulfilled promises made during opening statements, the court explained that "[t]rials are living and breathing beings. Nobody really knows when an opening statement is given exactly how the trial is going to unfold." At times, a defense counsel might "front" the arguments about how evidence might come in, but counsel is not bound by those arguments. The court reiterated that one of the last things the jury heard before deliberating was the instruction that defendant's failure to testify must not be held against him, and "I am not going to assume the jurors disregarded that because it is not plain error. It's not structural error." The court determined that trial counsel was not ineffective for making

remarks in opening about evidence that was not presented, and, therefore, appellate counsel was not ineffective for failing to raise the issue on direct appeal.

¶ 29    Finally, the court rejected the petition's claims of ineffective assistance as it pertained to the ballistics evidence and, specifically, Tobin's testimony. Preliminarily, the court rejected any suggestion that defense counsel was required to challenge all testimony from every witness; rather, counsel must not stipulate away the entire case or fail to subject the case to adversarial testing. The court also noted that, while it agreed with this court's decision regarding the sufficiency of the evidence, it remarked that "the firearm testimony was important in this case" and was "very much relied [up]on." Nevertheless, with respect to strategy, the court determined that the defense might have embraced the firearms and ballistics evidence, as it suggested that the gun used in the shooting was the same as used at the Speedway shooting and, as defendant also denied firing at Speedway, the perpetrator was somebody else.

¶ 30    Further, the court disagreed that trial counsel was ineffective for failing to propound the viewpoint offered by Tobin. The court noted that defense attorneys "often times, if not almost always" decline to object to this forensic science. Additionally, the court did not know whether, at the time of trial, defense counsel would have known about Tobin or his opinion. Moreover, the court found that Illinois case law has recognized and validated forensic firearms analysis, and neither the FBI nor AFTE, which contain some of the most respected scientists in the world, do not embrace Tobin's opinion. "[H]e is an [outlier] in the field of science without any question whatsoever." The court found "obviously absurd" Tobin's suggestion that firearms or fired evidence from them are not unique. Further, it noted that Tobin never examined the work Lind performed, which was peer reviewed and supported by another expert, and could not, therefore, say it was incorrect. Noting that it had found obvious dissimilarities in the images for which Tobin

- 13 -

found none, the court reiterated that Tobin's training was in metallurgy, not firearms examination and analysis.

¶ 31    The court agreed with Lind's statement that he could opine that a bullet was fired from a certain gun, but not to the exclusion of others, because to opine that no other weapon could have fired a bullet would require him to view every single .380-caliber gun in the entire world. Indeed, the court likened Lind's testimony that, to a reasonable degree of scientific certainty, the bullet was fired from a specific gun, to DNA testimony where the "match" is in the context of any given case. The court rejected the notion that, after the trial judge found Lind to be an expert in forensic firearms toolmark examination, trial counsel would be expected to,

> "put a witness on the stand who's going to say the judge was wrong, and national association are wrong, the FBI is wrong, and this testimony is not admissible, it's not reliable, and I do not find it would have changed the outlook and I don't know if it would have been [*sic*] benefitted the defendant anyway. There's been no showing of that."

In sum, the court determined that it could not find that, had the evidence been introduced, it would have assisted the defense's theory that somebody else fired the gun or the result would likely have been different. In particular, the court noted, even if Tobin had testified, his testimony would not have sufficiently contradicted Lind's testimony, because he "frankly doesn't know what the evidence was in this case, whether it was or was not consistent with the protocols and with the fired shell casing. He frankly doesn't know. That would have added very little to the jury."

¶ 32    Defendant timely appeals.

¶ 33                              II. ANALYSIS

¶ 34    On appeal, defendant raises three overarching arguments. First, defendant argues that the court erred in denying his petition because he demonstrated by a preponderance of the evidence

that he was denied effective assistance of trial counsel, where counsel did not challenge the ballistics evidence and made unfulfilled promises during opening statements. Second, defendant argues that the court erred in denying the petition because he established by a preponderance of the evidence that appellate counsel was ineffective for failing to raise a Rule 431(b) violation on direct appeal. Third, defendant argues that the cumulative effects of these errors denied him due process.

¶ 35 The Act provides a means by which a defendant may challenge his or her conviction or sentence for violations of federal or state constitutional rights. *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). The Act sets forth three stages of review. At the first stage, the circuit court may summarily dismiss a postconviction petition as frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2022). If the petition is not dismissed, it advances to the second stage. *Id.* § 122-2.1(b). At the second stage, the State may answer the petition or may move to dismiss it. *Id.* § 22-5. At this stage, the circuit court must determine whether the petition and its accompanying documentation make a " 'substantial showing of a constitutional violation.' " *People v. Domagala*, 2013 IL 113688, ¶ 33 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)).

¶ 36 If the petition survives the second stage, the defendant is entitled to a third-stage evidentiary hearing, where the circuit court acts as factfinder, determines the credibility of witnesses and the weight to be given to evidence, resolves any evidentiary conflicts, and determines whether the evidence demonstrates that the defendant is entitled to relief. *Id.* ¶ 34. A defendant is entitled to relief if he or she proves, by a preponderance of the evidence, that a constitutional right has been violated. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 37　When a petition advances to a third-stage evidentiary hearing where fact-finding and credibility determinations are involved, the court's decision will not be reversed unless it is "manifestly erroneous." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Manifest error is that which is "clearly evident, plain and indisputable." *People v. Marshall*, 375 Ill. App. 3d 670, 675 (2007). However, if no credibility determinations were made and the issues were pure questions of law, we apply a *de novo* standard of review. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 137. Usually, ineffective-assistance claims involve mixed questions of law and fact, therefore, we defer to the court's findings of fact, disturbing them only if they were against the manifest weight of the evidence, but we review *de novo* whether counsel rendered ineffective assistance. *Id*.

¶ 38　　　　　　　　A. Ineffective Assistance of Trial Counsel: Firearms Evidence

¶ 39　Defendant argues that the court erred in denying his postconviction claim that he received ineffective assistance at trial, where trial counsel failed to challenge the State's firearms identification evidence purportedly linking defendant to the offense. Defendant contends that the reliability of such forensic identification has been called into question. Defendant argues that he was deprived of effective assistance where, instead of acting as an adversarial check, counsel ignored increasing skepticism about the validity of firearms identification, left Lind's testimony unchallenged, and, therefore, the jury had no choice but to find that the retrieved gun was the same one used in both the Speedway shooting and the August 2011 murder. Defendant urges that counsel's failure was objectively unreasonable, where even the court recognized that the case against defendant "very much relied" on the ballistics testimony. According to defendant, although Lind testified that no two firearms have the same individual characteristics and that he could say to a reasonable degree of scientific certainty that the .380-caliber firearm he was provided fired the rounds and casings recovered from both shooting locations, his postconviction petition and

Tobin's testimony showed that there existed a plethora of data available at the time of trial demonstrating that forensic firearms identification is unreliable and subjective. Indeed, defendant notes, Tobin's claim that examiners often misidentify subclass characteristics and individual characteristics was bolstered by Lind's testimony at the hearing that he determined there was a match in this case based on "class and individual characteristics, without even mentioning subclass characteristics." Further, according to defendant, Lind was unable to give a clear answer as to what kind or number of differences would disqualify two items from being a match. Defendant argues that the court was incorrect to suggest trial counsel's decision might have been strategic or he might not have known about Tobin. According to defendant, strategic decisions first require investigation (see, *e.g.*, *People v. Gibson*, 244 Ill. App. 3d 700, 704-05 (1993)), and, here, had counsel conducted a thorough investigation, he would have known he should have challenged Lind's testimony, either through cross-examination or by calling his own expert witness to rebut Lind's conclusions and explain the methodological problems with forensic firearms identification. Defendant notes that his petition and Tobin's curriculum vitae demonstrate that articles and research on this topic date back as early as 2002, and his trial was in 2012, such that the information existed and was discoverable, had trial counsel investigated. These sources further reflect that the court was incorrect in finding Tobin's opinion to be an outlier in the field. Thus, defendant concludes, he established by a preponderance of the evidence that trial counsel's few questions on cross-examination, none of which challenged Lind or exposed the fundamental flaws in firearms analysis methodology, was unreasonable. Instead, he contends, the jury should have heard evidence from the defense about the flaws in both Lind's testimony and the underlying methodology of forensic firearms analysis, so as to make its own findings as to Lind's reliability.

¶ 40    In addition, defendant argues that counsel's deficient performance prejudiced him and there is a reasonable probability that, had trial counsel challenged the firearms identification evidence, he would not have been convicted.  Defendant again notes that the court agreed that the State's case against him "very much" relied on the firearm testimony, as well as the fact that, in closing argument, the State told the jury that this was "a CSI case."  Also, during deliberations, the jury asked the court whether there were any ".380-caliber bullets in the maroon car that have intact casings to directly link to the .380-caliber gun?  Requesting forensic evidence tying directly to the gun."  Defendant argues that the case turned on the firearms identification testimony, as the State's witnesses had severe credibility issues and police did not even investigate whether Golden, rather than defendant, was the shooter.  As such, he contends, trial counsel's failure to challenge the firearms evidence in any meaningful way undermines confidence in the outcome, and he requests that we reverse and remand for a new trial.  For the following reasons, we disagree.

¶ 41    A defendant who raises an ineffective-assistance-of-counsel claim must satisfy the two-prong test promulgated in *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  Specifically, the defendant must show that counsel's performance was objectively unreasonable (performance prong) and that there is a reasonable probability that, but for counsel's unreasonable performance, the result of the underlying proceeding would have differed (prejudice prong).  *Id.*; *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984).  A defendant must satisfy both prongs of the *Strickland* test to prevail on an ineffective-assistance-of-counsel claim, and the failure to satisfy either prong invalidates his or her claim.  *People v. Veach*, 2017 IL 120649, ¶ 30.

¶ 42    "To satisfy the deficient performance prong of *Strickland*, a defendant must show that [   ] counsel's performance was so inadequate 'that counsel was not functioning as the "counsel" guaranteed by the sixth amendment.' "  *People v. Dupree*, 2018 IL 122307, ¶ 44 (quoting *People*

*v. Evans*, 186 Ill. 2d 83, 93 (1999)). Courts evaluate performance based on the "prevailing professional norms" at the time of representation (*People v. Domagala*, 2013 IL 113688, ¶ 36), without the "distorting effects of hindsight" (*Strickland*, 466 U.S. at 689). In reviewing an ineffective-assistance claim, this court examines counsel's actions under the totality of the circumstances of the individual case. *People v. Shatner*, 174 Ill. 2d 133, 147 (1996). Judicial scrutiny of counsel's performance is highly deferential, and we give counsel's trial strategy a strong presumption of reasonable professional assistance. *Strickland*, 466 U.S. at 689. As defendant concedes, decisions regarding what evidence to present and which witnesses to call are generally matters of trial strategy (*People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005)), although counsel has a duty to make reasonable investigations (*People v. Pecoraro*, 175 Ill. 2d 294, 324-25 (1997)).

¶ 43    Here, we cannot agree that counsel's failure to challenge Lind's testimony with alleged flaws in firearms evidence methodology reflects that he was not functioning as the counsel guaranteed by the sixth amendment. Defendant cites our decision in *People v. Watson*, 2012 IL App (2d) 091328, ¶ 32, to argue that counsel's failure to challenge the firearm evidence in any meaningful way undermines confidence in the outcome. In *Watson*, we held, on direct appeal, that the defendant established his ineffective-assistance claim, where DNA evidence was the only evidence tying the defendant to the crime and counsel did not subject the forensic scientist's "partial match" opinion to any meaningful examination. *Id.* ¶¶ 32-33. Here, however, we have already held that there existed overwhelming evidence supporting defendant's conviction, even apart from that evidence tying him to a particular gun. *Smith*, 2015 IL App (2d) 130246-U, ¶ 83.

¶ 44    Further, we disagree that trial counsel did not effectively cross-examine Lind; although he did not explore or challenge Lind's methodology, he did establish that one recovered bullet, which

lacked its copper jacket, had a core diameter that could also be consistent with a 9-millimeter bullet, as well as that gunshot residue was not found anywhere in the white Grand Prix, the vehicle that the State alleged defendant drove during the shooting. This approach to cross-examination comports with defendant's overall trial strategy that, whoever fired shots at the Speedway shooting and murder scene, it was the same person but was *not* defendant. Additionally, defendant is incorrect that, at the postconviction hearing, Lind testified that he found a match based on class and individual characteristics without mentioning subclass characteristics. Rather, Lind testified that there were no subclass characteristics noted in the evidence, either in his examination or when submitting the evidence to the IFFIS system, and, thus, his conclusions were formed based on the two other categories of characteristics. Moreover, even accepting that, at the time of trial, there existed available authority challenging the scope and admissibility of forensic toolmark and firearms identification testimony,[1] trial counsel's failure to pursue a strategy here that challenged

[1]See, *e.g.*, *People v. Robinson*, 2013 IL App (1st) 102476, ¶ 91 ("in recent years, federal and state courts have had occasion to revisit the admission of expert testimony based on toolmark and firearms identification methodology. *** Courts have considered scholarly criticism of the methodology, and occasionally placed limitations on the opinions experts may offer based on the methodology. Yet the judicial decisions uniformly conclude toolmark and firearms identification is generally accepted and admissible at trial. Accordingly, we conclude the trial court did not err in ruling the testimony in this case was admissible ***, particularly where the trial judge barred the witnesses from testifying their opinions were 'within a reasonable degree of scientific certainty' "); see also *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 61 ("we understand the concerns raised by other courts and by the NCR in its report regarding the subjectivity of firearm identification testimony and the inability to test its accuracy *** [However]

Lind's methodology does not necessarily reflect that he was unfamiliar with that authority. Instead, given the defense's position that Golden or someone else was responsible for the shootings, it would not have been unreasonable for trial counsel to refrain from "bogging down" the jury with voluminous technical jargon and competing theories on the reliability of firearms identification methodology and to instead focus on how Lind's testimony might demonstrate someone else was the shooter. Again, while defendant does not presently agree that such a strategy would be reasonable, we afford counsel's strategic decisions great deference. *Strickland*, 466 U.S. at 689. Counsel could have reasonably determined it was better to simply approach Lind's testimony from the perspective that the alleged "match" Lind found was relevant only to the extent it demonstrated that another person, whether Golden or someone else, was responsible for both shootings, not defendant.

¶ 45    In any event, even if we were to assume for purposes of argument that defendant established deficient performance, we conclude that his claim fails because he cannot establish the requisite prejudice. With respect to the prejudice prong, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different, and " '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.' " *People v. Johnson*, 2021 IL 126291, ¶¶ 52, 55 (quoting *Strickland*, 466 U.S. at 693). A reasonable probability that, but for counsel's errors, the result of the proceeding would have been different is one sufficient to undermine our confidence in the outcome. *Id.* ¶ 54. Moreover, satisfying the prejudice prong necessitates a

[t]oolmark and firearm identification evidence is not new or novel ***. Far from being unsettled, the law in Illinois is consistent in its admission of such evidence").

showing of actual prejudice, not simply speculation of possible prejudice. *Id.* ¶ 55; *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 46    Here, to be sure, the ballistics evidence was highlighted by the State and was on the jurors' minds during deliberations.  However, we do not agree with defendant that Tobin's testimony or other evidence similar thereto would likely have resulted in a different outcome.  First, Tobin's testimony did not establish that Lind's opinion regarding the evidence, which was reviewed by a second firearms examiner before it was issued, was wrong.  He never actually compared the projectiles and the gun in this case, and he agreed that he did not know if they were consistent.  Theoretically, Tobin might have reviewed the evidence in this case, specifically accounted for subclass characteristics, and *agreed* with Lind's conclusions.  Thus, Tobin's testimony did not, in fact, contradict Lind's opinion.  Defendant argues that it does not matter that Tobin did not examine the evidence, particularly where Tobin's opinion is that the methodology is flawed and, so there was no reason for him to personally engage in what he contends is a faulty process.  While we understand this point, it remains that Tobin acknowledged that forensic firearms identification may be effective and probative in comparing similarities, for feature comparison, and in pattern matching practices.  Further, Tobin acknowledged that firearms examiners could properly render certain opinions about the evidence, just not that those opinions were within a reasonable degree of scientific certainty.  Here, however, as he did not examine the evidence, Tobin could not testify that Lind's findings were faulty *even within those parameters* that he agreed are appropriate.

¶ 47    Second, Tobin opined that subclass characteristics are often ignored and mistaken for individual characteristics.  However, Tobin's testimony therefore suggests that, even if the jury should not have accepted Lind's conclusion that *individual* characteristics demonstrated a "match," it nevertheless *would* have been acceptable for it to find, based on *subclass*

characteristics, that the bullets and casings came from either the recovered firearm or another firearm in the *same production lot*. While Tobin explained that several thousand weapons may be produced in the same lot, opining that it was the recovered weapon or one produced in the same lot as the recovered weapon would still have narrowed the pool to a degree that the jury would not likely have found differently based upon this distinction. Whether the jury was told the bullets and casings were fired from this firearm or a firearm made in the same lot as this firearm, it would not likely have changed the outcome in this case.

¶ 48    Third, and similarly, Tobin took issue with Lind's statement that he reached his conclusions within a "reasonable degree of scientific certainty," explaining that, now, the strongest opinion that is scientifically and forensically defensible is that a "specific firearm could not be eliminated as the firing platform." He agreed that a firearms examiner could also defensibly opine that there were no inconsistencies between a shell casing and a firearm. We do not agree that the jury here would have found differently, had Lind testified that the recovered firearm could not be eliminated as the firing platform or that there were no inconsistencies between the shell casing and firearm. Indeed, at the postconviction hearing, Lind testified that his opinion was consistent with this approach, in that he could say the firearm matched the bullets and casings, but not to the exclusion of all other firearms, unless he subjected all other firearms to testing. Had Lind testified that, based on various characteristics and examination, this .380-caliber firearm in evidence could not be excluded as the firing weapon, the result of the trial would not have been different.

¶ 49    Moreover, defendant's argument is premised on the notion that the case turned on the firearms evidence due to the weak credibility of the State's witnesses. We disagree. Again, defendant's theory at trial was that he was not the shooter and that Charleston, the only person tying him to the recovered gun (the gun that Lind used to compare with the bullets and casings),

was incredible. However, even if counsel had more robustly challenged Lind's testimony or the reliability of forensic firearms identification processes, this court previously determined that evidence *other* than that tying him to the gun also overwhelmingly supported the conviction. Namely, as previously summarized, we recounted evidence supporting the State's theory that defendant was a participant in the common design to commit the offense and determined that there remained overwhelming evidence to support defendant's guilt as a participant in the crime, "*regardless of the weapon he used.*" *Smith*, 2015 IL App (2d) 130246-U, ¶ 83. In sum, although the ballistics evidence featured prominently at trial, defendant has not demonstrated that, had trial counsel challenged the methodology or presented evidence consistent with Tobin's opinion, the result would have been different.

¶ 50    B. Ineffective Assistance of Trial Counsel: Promises During Opening Statements

¶ 51    Next, defendant argues that the court erred in denying his ineffective-assistance claim based upon trial counsel's unfulfilled promises made during opening statements. Defendant primarily focuses upon counsel's representation in opening statements that the jury would hear from defendant and would hear him say that he did not commit the crime. Despite this assertion, defendant did not testify at trial and his videotaped interrogation was not introduced. As such, defendant argues that trial counsel made an objectively unreasonable gamble about exculpatory evidence that was not produced, without explanation, for the jury. Further, defendant notes, counsel promised the jury it would hear evidence that Golden was connected to Charleston, and it would hear that they were connected because they served time together in the Lake County jail and were "two elderly African-American men, both drug users, both hang[ing] with the same crowd." No such evidence was presented. Defendant argues that, when the failure to present promised testimony did not result from unforeseeable events, the failure to fulfill the promise may

constitute ineffective assistance.  See, *e.g.*, *People v. Briones*, 352 Ill. App. 3d 913, 918-19 (2004) (determining that trial counsel performed deficiently by telling the jury that the defendant would testify to the truth and, inexplicably, failed to call him; "in no sense could it serve the defendant's interest").  Here, he contends, there were no unforeseeable events that would justify counsel's broken promises to the jury or constitute reasonable trial strategy; rather, counsel simply gambled in his opening statement that the State would introduce the interrogation video, which it did not, and, in any event, counsel took an unreasonable risk because he was powerless to force the State to do so.  Further, defendant contends that the deficient performance prejudiced him, where it damaged both counsel's and defendant's credibility and where there were no safeguards protecting him from negative inferences, as the prospective jurors had not been asked pursuant to Rule 431(b)(4) whether they understood and accepted that a defendant's failure to testify cannot be held against him.  He argues that, where the case came down to witness credibility, there is a reasonable probability that the jury would have reached a different verdict, had it not been given reason to doubt his and counsel's credibility.  We disagree.

¶ 52    Preliminarily, defendant could have, but did not, raise this argument on direct appeal and, so, it is forfeited.  *People v. English*, 2013 IL 112890, ¶ 22. However, he also argues that appellate counsel was ineffective for not raising the issue on direct appeal and, thus, we will relax the forfeiture rule.  *Id.*

¶ 53    Even if defendant could establish that counsel rendered deficient performance by making unfulfilled promises to the jury, his claim fails to satisfy the prejudice prong of the ineffective-assistance analysis.  See *Johnson*, 2021 IL 126291, ¶ 53 (we may proceed directly to the prejudice prong without determining whether counsel's performance was deficient); *Veach*, 2017 IL 120649, ¶ 30 (the failure to satisfy either prong of the *Strickland* test defeats the ineffective assistance

- 25 -

claim). It is true that witness credibility was an issue in this case. However, even assuming counsel's opening comments constitute deficient performance, the promises that the jury would hear that defendant "did not do this" and that Charleston and Golden were connected were achieved throughout trial in other ways. For example, counsel arguably eviscerated Charleston's credibility and thoroughly attacked the credibility of Bones, witnesses purportedly tying defendant to the crime. From defendant's cross-examination of Adams, the jury learned that Adams was generally aware that Golden was charged with trying to hire someone to kill him and that no police officer spoke to him about that case. In counsel's questions to detective Florance, he asked about Charleston and Golden, whether they were both career criminals living in the area and whether they were roughly the same age, touching upon the theme presented in opening statements. Counsel successfully obtained Florance's testimony that, indeed, Golden was convicted of trying to hire an undercover officer to murder Adams and, moreover, that the police did not investigate either whether Golden was involved in this August 2011 shooting or if there were connections between Charleston and Golden. Further, at counsel's request and in front of the jury, the court took judicial notice of the case wherein Golden was convicted for soliciting Adams' murder. Thus, this case is unlike *Briones*, where the court held there was prejudice for multiple reasons; namely, because trial counsel's pursuit of certain strategies was refutable, *and* counsel performed deficiently by failing to present promised testimony by the defendant, *and* in allowing the jury to be mis-instructed, *and* where the trial court had commented at the close of the State's case that the evidence against the defendant was not overwhelming. *Briones*, 352 Ill. App. 3d at 921; see also *People v. Suggs*, 2022 IL App (2d) 200713, ¶¶ 31-34 (rejecting ineffective-assistance claim based on promises made during opening statements, where the attorney promised that the jury would hear from police officers that the defendant denied throwing a glass, but could not have foreseen

- 26 -

that the State would not call the officers at trial).  Here, while the exact *evidence* counsel promised in opening statements was not introduced, the evidence that *was* produced touched on those promised themes.

¶ 54    Moreover, we emphasize that the jury was instructed that (1) opening statements are meant to acquaint the jury with the facts that the attorneys expect to prove, but they are not evidence and any statements or arguments made by the attorneys which were not based on the evidence should be disregarded; and (2) defendant was not required to prove his innocence and the fact that he did not testify could not be considered by the jury in any way.  As such, we disagree with defendant that there was no safeguard to protect him from negative inferences.  See *Suggs*, 2022 IL App (2d) 200713, ¶¶ 33-34 (when promised evidence was not presented, the jury instructions were an appropriate factor to consider in deciding whether the defendant was prejudiced).  Further, "[t]he jury is presumed to follow the instructions the court gives it."  *People v. Taylor*, 166 Ill. 2d 414, 438 (1995).  In sum, viewing the record as a whole, there is no reasonable probability that the jury would have reached a different verdict, had counsel not made the challenged remarks in opening statements.

¶ 55    C. Ineffective Assistance of Appellate Counsel: Opening Statements and Rule 431(b)

¶ 56    Defendant next argues that his appellate counsel rendered ineffective assistance by failing to raise on direct appeal trial counsel's broken promises made during opening statements. Defendant notes that a broken promise concerning a jury's opportunity to hear from a defendant is a well-recognized basis for an ineffective-assistance claim and that all of the evidence needed to raise this claim was contained in the appellate record.  We reject defendant's argument.  Claims of ineffective assistance of appellate counsel are measured by the same standards described above for ineffective-assistance-of-trial-counsel claims.  See *People v. Childress*, 191 Ill. 2d 168, 175 (2000).

Moreover, to establish the requisite prejudice, defendant must show that the issue, if raised, would have been meritorious. *Id.*; see also *People v. Pitsonbarger*, 205 Ill. 2d 444, 464 (2002) ("if the underlying claim has no merit, no prejudice resulted," and the claim of ineffective assistance of counsel on direct appeal must fail). Here, therefore, the court properly denied defendant's claim, where we have determined that defendant's claim of ineffective assistance of trial counsel based on unfulfilled promises made during opening statements was not meritorious. Thus, appellate counsel cannot be ineffective for failing to raise the non-meritorious claim.

¶ 57    Next, defendant also argues that the court erred in denying his petition, where he established by a preponderance of the evidence that appellate counsel was ineffective for failing to raise on appeal the issue of the trial court's Rule 431(b) violation. Specifically, the trial court failed to ask potential jurors, in compliance with Rule 431(b)(4), whether they understood and accepted that a defendant's decision not to testify cannot be held against him. Defendant argues that, since 2007 (and, thus, in effect at his 2012 trial), Rule 431(b) has required courts to ask potential jurors whether they understand and accept four legal principles, regardless of whether the defendant so requests. Ill. Sup. Ct. R. 431(b) (eff. May 1, 2007). He notes that the rule is clear and unambiguous and the trial court has an affirmative duty to *sua sponte* ask the potential jurors whether they understand and accept the four principles. See *People v. Birge*, 2021 IL 125644, ¶ 31. Defendant points out that everything needed to raise this issue was contained in the record on appeal and, thus, appellate counsel's failure to raise the issue was objectively unreasonable. Moreover, defendant argues that he was prejudiced by the court's error, where the error was compounded by trial counsel's unfulfilled promise during opening statements that the jury would hear from defendant. We disagree.

¶ 58    We note first that one expressed reason for the postconviction court's dismissal of this claim was incorrect, as at the time of defendant's trial, the court was obligated to ask prospective jurors about all four Rule 431(b) principles, regardless of whether defense counsel asked the court to do so.  See Ill. Sup. Ct. R. 431(b) (May 1, 2007); see also *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).  However, the postconviction court nevertheless did not err in denying this claim.  Defendant concedes that trial counsel did not object or raise this issue before the trial court and, thus, to circumvent forfeiture, appellate counsel would have been constrained by raising the issue as plain error.  See, *e.g.*, *People v. Sebby*, 2017 IL 119445, ¶ 48 (to avoid forfeiture, defendant must object at trial and raise the issue in a posttrial motion); *Thompson*, 238 Ill. 2d at 611-12 (where the defendant did not object at trial or raise the issue in a posttrial motion, Rule 431(b) violation was forfeited and considered only for plain error).  Defendant argues that this clear error would have amounted to a successful plain-error claim because the evidence in this case was closely balanced. *Id.* (forfeiture may be excused when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error).  Again, we disagree.

¶ 59    The error here did not threaten to tip the scales of justice against defendant.  As previously noted, although the prospective jurors were not asked if they understood and accepted that defendant's failure to testify could not be held against him, the jury was instructed before deliberations that defendant did not need to prove his innocence and that it could not consider defendant's failure to testify in any way while reaching a verdict.  We have no reason to assume the jury was biased against defendant due to the Rule 431(b) violation or that it ignored its instructions consistent with the Rule 431(b)(4) principles.  See *Thompson*, 238 Ill. 2d at 614-15 (discussing Rule 431(b) in the context of rejecting a structural plain-error argument and noting that

"the failure to conduct Rule 431(b) questioning does not necessarily result in a biased jury" and, while it is one method of helping to ensure the selection of an impartial jury, "we cannot conclude that Rule 431(b) questioning is indispensable to the selection of an impartial jury"); *Taylor*, 166 Ill. 2d at 438 ("[t]he jury is presumed to follow the instructions the court gives it").  Moreover, to determine whether the evidence was closely balanced, such that the error threatened to tip the scales against defendant, we evaluate the totality of the evidence (see *Sebby*, 2017 IL 119445, ¶ 53), and, here, this court previously held on direct appeal that the evidence against defendant was overwhelming (*Smith*, 2015 IL App (2d) 130246-U, ¶ 83).  As such, defendant has not established that, even if the prospective jurors had been properly questioned pursuant to Rule 431(b)(4), the jury's verdict would have differed.  Because defendant fails to establish that his plain error claim would have been successful on direct appeal, appellate counsel was not ineffective for failing to raise the claim.

¶ 60        D. Ineffective Assistance of Postconviction Counsel: Rule 431(b)

¶ 61    Defendant also argues that his postconviction counsel provided unreasonable assistance where counsel did not correct the postconviction court's incorrect statement that, with respect to Rule 431(b)(4), there was no error because trial counsel had not requested that question.  Defendant argues that the court was clearly incorrect, and postconviction counsel's failure to correct the court's misapprehension of law reflects a failure to adequately present defendant's claim of a Rule 431(b) violation.  Defendant alleges that counsel's comment, "I am not going to disagree with your Honor," reflected not just a failure to correct but, in fact, acquiescence to the incorrect statement of law.  Defendant argues that counsel should have been familiar with the law regarding Rule 431(b) violations, "as that was a claim he had raised for [defendant] in the petition."

¶ 62    The Act requires a reasonable level of assistance from counsel during postconviction proceedings. *People v. Moore*, 189 Ill. 2d 521, 541 (2000). To ensure a reasonable level of assistance, Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) requires that the record reflect that postconviction counsel consulted with defendant to ascertain his or her contentions of constitutional deprivation, examined the record of the trial proceedings, and made any amendments to the *pro se* petition necessary for an adequate presentation of defendant's constitutional contentions. *Id.* We review *de novo* whether postconviction counsel complied with the level of representation contemplated by Rule 651(c). See *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007). In addition, at a third-stage hearing, where Rule 651(c)'s duties regarding the petition itself are no longer governing, counsel's performance remains governed by a standard of general reasonableness. See, *e.g.*, *People v. Pabello*, 2019 IL App (2d) 170867, ¶¶ 26-37 (also noting that, if postconviction counsel's performance would not be ineffective under the higher *Strickland* test, it would not be deficient under the postconviction standard); see also *People v. Addison*, 2023 IL 127119, ¶ 38 ("this court has not prescribed by rule specific duties that counsel must perform at the third stage").

¶ 63    Here, defendant does not appear to dispute that postconviction counsel provided reasonable assistance overall; rather, and despite acknowledging that postconviction counsel raised the Rule 431(b) claim on his behalf, defendant complains that counsel did not adequately present that claim where he did not correct the trial court's misstatement of law. While we agree that the court's statement was incorrect, we disagree that counsel was unreasonable for effectively sidestepping a disagreement with the court so he could pursue defendant's overarching argument. Specifically, in closing arguments after the hearing, the court interrupted counsel, who was in the middle of arguing that trial counsel was ineffective for promising that the jurors would hear from defendant,

particularly in light of the trial court's Rule 431(b) failure. The court interrupted, stating, "I'm going to stop you there for a second," and told counsel that the trial court did not commit plain error with respect to Rule 431(b). The transcript reflects that counsel responded, "okay," and, when the court continued to comment that the law reflected no error, counsel responded, "I'm not going to disagree with your Honor," and requested to continue his argument, namely, that the Rule 431(b)(4) question was nevertheless not asked and the postconviction petition claims were are all connected. We read this exchange as reflecting not that postconviction counsel acquiesced in the court's misstatement of law or did not adequately pursue the claim but, rather, that counsel was trying to impress upon the court that, whatever the reason, the trial court simply did not ask the jurors the question posed by Rule 431(b)(4) and, in this case, that failure mattered, in light of defendant's contentions regarding ineffective assistance and the alleged closeness of the evidence. In sum, we disagree that postconviction counsel provided unreasonable assistance.

¶ 64                                    E. Cumulative Error

¶ 65    Defendant's final argument is that, although individual trial errors may not have required reversal, they cumulatively deprived him of his right to effective assistance of counsel and a fair trial and rendered the result of the proceedings unreliable. We disagree.

¶ 66    Cumulative error can arise only from actual trial errors and can occur only when there is more than one error. See *People v. Quezada*, 2024 IL 128805, ¶ 46. In this case, we have acknowledged only one error, *i.e.*, the trial court's failure to comply with Rule 431(b)(4), but that error was not properly preserved and did not give rise to a successful ineffective-assistance or plain-error argument. Similarly, even where we have elsewhere, for purposes of argument, presumed deficient performance, we ultimately concluded that there was no prejudice and,

therefore, no successful ineffective-assistance claims. As such, defendant has not established more than one error that cumulatively deprived him of due process.

¶ 67                                III. CONCLUSION

¶ 68     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 69     Affirmed.